*In re* MARRIAGE OF DAGMAR ANN WEINBERG, Petitioner-Appellee and Cross-Appellant, and PETER E. WEINBERG, Respondent-Appellant and Cross-Appellee.

First District (5th Division)   No. 83—624

Opinion filed February 24, 1984.—Rehearing denied July 11, 1984.

Rinella & Rinella, Ltd., of Chicago (Barry Schatz and Joel Ostrow, of counsel), for appellant.

Beermann, Swerdlove, Woloshin, Barezky & Berkson, of Chicago (Miles N. Beermann and Howard A. London, of counsel), for appellee.

JUSTICE SULLIVAN delivered the opinion of the court:

This is an appeal from an amended judgment for dissolution of marriage. Respondent contends that (1) the trial court's valuation of certain marital property was contrary to the manifest weight of the evidence; and (2) the trial court abused its discretion in (a) unfairly ap-

portioning the marital assets and liabilities, (b) awarding permanent maintenance to petitioner, and (c) ordering him to pay excessive attorney fees.

Judgment for dissolution was entered on April 16, 1982, and subsequently amended on February 7, 1983. No issues pertaining to the orders dissolving the marriage and awarding custody of the children to petitioner. are raised in this appeal. Testimony and evidence introduced at protracted evidentiary hearings established that the parties were married in December 1962 and adopted three children: Bruno, born in 1965; Elsa, born in 1967; and Alexander, born in 1976. During the first two years of the marriage, petitioner worked part-time as a model and receptionist while respondent completed his resident training in radiology, but throughout the remainder of the marriage petitioner was an unemployed homemaker. After serving two years in the Army, respondent worked as a radiologist, completed a fellowship in neuroradiology, and commenced working as a neuroradiologist at Northwestern Hospital in Chicago. He was employed by the Northwestern Radiology Group, S.C. (Group), a professional corporation in which he was one of 13 partners, and also had his own professional consulting firm, Peter E. Weinberg, M.D.S.C. (M.D.S.C.), of which he was the sole shareholder. In 1972, the couple purchased a cooperative apartment for $43,000, spent an additional $50,000 for its rehabilitation and redecoration, and hired household help to assist petitioner in its upkeep. For several years, the family traveled extensively, but when they lost the services of a babysitter who usually accompanied them, they rented a house in South Hampton, New York, for family vacations, and in the fall of 1978 they purchased a home there for $448,000. In November 1979 respondent moved out of the marital residence, and in February 1980 petitioner filed a petition for legal separation. Respondent thereafter counterpetitioned for dissolution, and in March 1981, petitioner filed an amended petition also seeking dissolution. The evidence presented on the issues relating to property disposition, maintenance, and child support is voluminous, and we shall set forth only those portions and the trial court's findings thereon as are relevant to the issues as they are discussed.

In the amended judgment for dissolution of marriage, the following valuation and distribution or property was made:

| Assets | Petitioner | Respondent |
| --- | --- | --- |
| Marital resident (co-op) | $390,000 | |
| Furnishings (co-op) | 25,000 | |

| | Petitioner | Respondent |
|---|---|---|
| Art objects | 25,000 | $129,625 |
| Proceeds from sale of South Hampton vacation home | | 885,000 |
| Cash | | 13,455 |
| M.D.S.C. stock | | 5,610 |
| M.D.S.C. profit sharing plan | | 17,818 |
| M.D.S.C. pension plan (value disputed) | | 103,828 |
| Northwestern Radiology Group stock | | 6,000 |
| Northwestern Radiology Group profit sharing plan | | 39,838 |
| Northwestern Radiology Group pension plan—valued in excess of $207,613 | 50% of net portion accrued during marriage | 50% of net portion accrued during marriage |
| | $440,000* | $1,201,174* |

*Excluding value of Group pension plan

| Liabilities | Petitioner | Respondent |
|---|---|---|
| Third party loans for acquisition of South Hampton property | | $375,000 |
| Real estate commissions for purchase and sale of South Hampton property | | 52,700 |
| Loans from retirement plans | | 217,466 |
| Taxes due on South Hampton property | | 110,085 |
| Miscellaneous loans | | 85,700 |
| Income tax deficiency for disallowed deductions during 1976-1979 | | $200,000-250,000* |

*The precise amount of this debt was unknown at the time of judgment but was itemized by respondent in his brief as $200,000.

| | Petitioner | Respondent |
|---|---|---|
| | - 0 - | $1,040,951 |
| Net award ......................... | $440,000 | $ 160,223 |

OPINION

■ Before examining the merits of this case, we considered petitioner's motion to dismiss wherein she asserts that respondent did not comply with Supreme Court Rule 303(a) which requires that a notice of appeal be filed within 30 days after entry "of the final judgment appealed from." (87 Ill. 2d R. 303(a).) She maintains that the amended

judgment for dissolution appealed from was not a final order because it left unresolved a substantial controversy concerning the division of certain artwork.

The amended judgment, entered February 15, 1983, provided in paragraph seven an award to petitioner of all the household furnishings "except for certain personal effects of respondent and items of fine art which are to be agreed upon by the parties. If the petitioner and respondent cannot agree as to the personal effects and items of fine art, the Court shall decide which items shall be awarded to the respondent. The Court reserves jurisdiction for this purpose." In paragraph eight, it was stated that "[t]he parties have presented to the Court a list of items of fine art having a total value of $154,625. Petitioner shall select and shall have as her sole and separate property items from this list having a value of $25,000. The Court reserves jurisdiction to determine values if the parties are unable to do so."

On March 4, 1983, respondent filed a "Motion to Clarify and Other Relief" in which he sought the trial court's intervention because the parties had been unable to reach agreement as to the physical division of the artwork. On March 11, 1983, he filed this appeal from the amended judgment, and on April 25, 1983, the trial court entered an order directing petitioner to select her share of the artwork within 30 days.

■ It is well settled that "[a] decree is final if it determines the ultimate rights of the parties with respect to distinct matters which have no bearing on other matters left for future consideration or if the matters left for future determination are merely incidental to the ultimate rights which have been adjudicated by the decree." (*Barnhart v. Barnhart* (1953), 415 Ill. 303, 309, 114 N.E.2d 378, 381; *People ex rel. Valle v. Valle* (1983), 113 Ill. App. 3d 682, 447 N.E.2d 945.) In the instant case, the trial court placed a value on the total collection of artwork and then awarded a specific monetary portion thereof to each party, reserving jurisdiction to divide the collection if the parties were unable to do so. It appears to us that the physical division was incidental to the ultimate rights adjudicated and, being so, it had no bearing on the finality of the order appealed from. (See *Intaglio Service Corp. v. J. L. Williams & Co.* (1983), 112 Ill. App. 3d 824, 445 N.E.2d 1200.) Thus, the amended judgment for dissolution being a final order from which respondent filed a timely notice of appeal, we deny petitioner's motion to dismiss.

■ We will first consider respondent's contention that the trial court's valuation of the marital residence was contrary to the manifest weight of the evidence. We have often held that conflicts in testi-

mony concerning the valuation of assets in an action for dissolution of marriage are matters to be resolved by the trier of fact (*In re Marriage of Ayers* (1980), 82 Ill. App. 3d 164, 402 N.E.2d 401), and respondent concedes that so long as the valuation of the court was within the range testified to by the expert witnesses, it ordinarily will not be disturbed on appeal (*In re Marriage of Evans* (1980), 85 Ill. App. 3d 260, 406 N.E.2d 916, *rev'd on other grounds* (1981), 85 Ill. 2d 523, 426 N.E.2d 854); nevertheless, he argues that the trial court erred in accepting the "rock bottom" estimate of a witness for petitioner whose unfamiliarity with the apartment and failure to allow for market conditions beyond the day of her testimony destroyed her credibility and, hence, her valuation of the property. Specifically, he maintains that the witness, Mrs. Beliard, upon whose valuation the trial court relied, understated the size of the apartment by 100 square feet and mistakenly described the kitchen as "old" when, in fact, it had been remodeled in 1972; and that her estimate, which was based on the then-depressed housing market and which she admitted was a conservative figure, assumed an imminent sacrifice sale under the most dismal circumstances, and thus was unrealistically low.

■ Initially, we note that Mrs. Beliard's evaluation of "$370,000 to $390,000" allowed a $20,000 margin of error; therefore whatever slight miscalculations she may have made in the size of the apartment or in the age of kitchen furnishings do not appear to significantly undermine the overall estimate. Moreover, on cross-examination, she stated that the square footage was not a conclusive factor in her evaluation, but only one of many which she considered. Similarly, she said that regardless of its age, the kitchen required remodeling, and this was corroborated in part by respondent's appraiser who described the kitchen as "slightly detrimental" to the saleability of the apartment. With respect to the state of the housing market, the record reveals that the trial court noted that due to the $2,000-per-month assessments on the apartment, petitioner might be forced to sell, and therefore acceptance of the current value amount was not inappropriate. Furthermore, after hearing the testimony of both real estate experts, the trial court explained the basis for its valuation, noting Mrs. Beliard's credentials and experience in real estate and, in particular, her "intimate knowledge" of the building in which the Weinbergs' apartment was situated, and her firm's involvement in the recent sales of two other units in that same building which she had used as the comparables for her evaluation. Conversely, after noting that the "comparables" used as the basis for the valuation made by respondent's appraiser were not of units in the same building, and in fact were

apartments of an "entirely different character" from that of the Weinbergs, the trial court stated, "I weighed together the testimony of the two appraisers. There was no question in my mind that Mrs. Beliard had a far more clearly-based and soundly-based opinion. *** [B]ecause of her intimate knowledge of the building and the apartment, I basically accepted her testimony and I find the value *** is $390,000." Under these circumstances, we do not believe that finding was contrary to the manifest weight of the evidence.

Respondent also contends that the trial court's valuation of the M.D.S.C. pension plan fund at over $103,000 was unsupported by the evidence. He maintains that the only witness who testified to the value of the plan stated that his benefits thereunder were only 60% vested and had a current value of about $12,000, but that even if respondent, as sole trustee of the plan, elected to amend the vesting schedule to cause an immediate 100% vesting, the present cash value would increase to only $20,000.

This witness, however, also testified that according to an accountant's audit, the assets of the plan as of October 1980 totaled about $103,000, which included a $2,000 bank deposit, the cash surrender value of a life insurance policy, an $85,849 note receivable and $11,605 interest due thereon, the last two figures representing the amount respondent borrowed from the plan, which the court ordered to be repaid from the proceeds of the sale of the South Hampton property in order to restore the plan to a fully-funded status. Respondent posits that notwithstanding this repayment and his ability to become 100% vested, the plan benefits were only 60.3% accrued, entitling him to withdraw no more than $61,000, which would then be taxable at ordinary income rates, resulting in a net value of only $51,000.

■ Petitioner responds to this argument by directing our attention to title 29, section 1344, of the United States Code, which governs the allocation of assets upon termination of a retirement plan. That paragraph provides, in pertinent part:

"(a) *** In the case of the termination of a defined benefit plan, the plan administrator shall allocate the assets of the plan (available to provide benefits) among the participants and beneficiaries of the plan in the following order:

(1) First, to that portion of each individual's accrued benefit which is derived from the participant's contributions to the plan which were not mandatory contributions.

(2) Second, to that portion of each individual's accrued benefit which is derived from the participant's mandatory con-

tributions.

\* \* \*

(d) \*\*\* (1) Any residual assets of a single employer plan may be distributed to the employer if—

(A) all liabilities of the plan to participants and their beneficiaries have been satisfied \*\*\*." (29 U.S.C. sec. 1344 (1976).)

It appears, therefore, that even upon premature termination of the plan, respondent, in his dual capacity as sole participant in the plan as well as sole shareholder in the corporation, will be entitled to receive the full amount of assets therein. Apparently cognizant of this distribution procedure, the trial court stated:

"I think you have to look reality in the face. The reality is that when the dust settles, there is going to be an excess of $100,000 in the M.D.S.C. Pension Plan. Dr. Weinberg is the sole employee of that corporation. He is the sole beneficiary of the plan. With a stroke of the pen he can go from 60 percent vested to 100 percent vested. \*\*\* [W]hen you have $100,000 in a plan and Dr. Weinberg is the sole beneficiary of [it] and has it in his power to control the benefits that are to be paid under [it], it is impossible for me to conclude that I should value the plan at $12,000 or \*\*\* $20,000. The inescapable conclusion is that the plan is worth at least $103,000 shown in the accountant's report of October, 1980. \*\*\* So, I value the M.D.S.C. Pension Plan at $103,828."

Our review of the record reveals that the trial court reached this conclusion only after hearing extensive testimony and arguments and after reviewing all of the relevant financial documents. The credibility of witnesses and the weight to be given their testimony is a matter for the trier of fact (*Department of Revenue v. Marion Sopko, Inc.* (1980), 84 Ill. App. 3d 953, 406 N.E.2d 188), and we see no reason here to disturb the trial court's determination as to the valuation of the plan.

Similarly, with respect to the contingent tax consequences of a distribution of benefits under this plan, as well as those under the Group pension plan, the record indicates that the trial court considered the projections submitted by respondent's counsel but rejected them as overstated and further noted that in the event the benefits were taxed, at some future date, at the highest possible rate, respondent could then request a modification of the maintenance payments on the basis of a change in his financial circumstances. Thus, we cannot say that the trial court abused its discretion in refusing to value the

pension plan at less than the evidence established the assets therein were currently worth or to reduce its value by an incalculable future tax liability.

Respondent also contends that the trial court's division of marital assets and liabilities was inequitable. The focal point of his lengthy argument on this issue is that the outright award of the cooperative apartment, the principal marital asset, to petitioner, in conjunction with the assignment of all of the marital liabilities to him, constituted an abuse of discretion by the trial court.

■ Section 503(c) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1981, ch. 40, par. 503(c)) requires that the trial court divide the property in "just proportions." In so doing, the court is not bound to make an equal division (*In re Marriage of Lloyd* (1980), 81 Ill. App. 3d 311, 401 N.E.2d 328); rather, after considering all relevant factors, it may, in its discretion, distribute the property in whatever proportions it deems equitable (*In re Marriage of Lee* (1979), 78 Ill. App. 3d 1123, 398 N.E.2d 126) subject to reversal only where there was an abuse of discretion resulting in substantial injustice (*In re Marriage of Sevon* (1983), 117 Ill. App. 3d 313, 453 N.E.2d 866).

Among the relevant factors to be considered by the court in its division of the marital property are those enumerated under section 503(c), the most pertinent of which, for purposes of this case, include: the contribution or dissipation of each party in the acquisition and preservation of the marital property (Ill. Rev. Stat. 1981, ch. 40, par. 503(c)(1)); the duration of the marriage (Ill. Rev. Stat. 1981, ch. 40, par. 503(c)(3)); the relevant economic circumstances of each spouse when the property division is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods to the spouse having custody of the children (Ill. Rev. Stat. 1981, ch. 40, par. 503(c)(4)); the age, health, occupation, amounts and sources of income, skills, employability, estate, liabilities and needs of each party (Ill. Rev. Stat. 1981, ch. 40, par. 503(c)(7)); whether the apportionment is in lieu of or in addition to maintenance (Ill. Rev. Stat. 1981, ch. 40, par. 503(c)(9)); and the reasonable opportunity of each spouse for future acquisition of capital assets and income (Ill. Rev. Stat. 1981, ch. 40, par. 503(c)(10)).

■ In the instant case, the trial court conducted hearings preceding the entry of both the original and amended judgments wherein it summarized the voluminous evidence and delineated its findings thereon, correlating them to the factors set forth above. The court found that respondent had been "the dominant factor for acquiring

the wealth," and contrary to petitioner's allegations, specifically noted that respondent's financial ventures which resulted in substantial liabilities, though ill-advised, did not constitute dissipation; that this was an 18-year marriage during most of which petitioner was unemployed; that petitioner, then 41 years old and custodian of the two minor children, was in somewhat poor health and, while not unemployable, had an exceedingly limited earning capacity compared to that of respondent, a 46-year-old neuroradiologist whose gross income was about $200,000 annually. Thereafter, the court, expressing its intent to achieve an apportionment of 55% to petitioner and 45% to respondent, ordered an immediate distribution of property totaling $440,000, which included the marital residence, to petitioner and awarded to respondent assets valued at $1,201,174, out of which he was to pay $1,040,951 in marital liabilities, leaving him with a net award of $160,223—which resulted in a 73/27% immediate division in favor of petitioner. In addition, however, the court ordered an in-kind division of that portion of the Group pension benefits accruing during the marriage, which was valued at a minimum of $207,613, and while the inclusion of these benefits does not alter the above percentages, the court's concomitant order of future repayment therefrom by petitioner to respondent of up to 50% of the current $200,000 tax liability will eventually reduce her one-half share of whatever amount to which the current accrued benefit of $207,613 has appreciated, and will correspondingly increase respondent's share by the same amount. To illustrate, assuming that respondent remains in the plan until age 60, petitioner's entitlement will be no less than $168,000 (one-half of the actual distribution of $336,000 as computed by respondent's expert witness and accepted by the court as a minimum value[1]), out of which she will then repay her portion of the tax obligation. She will then have received a total award of about $508,000 ($440,000 + $168,000 - $100,000). Respondent will also receive at least $168,000 from the portion of the plan accrued during the marriage, but his award will be further augmented by the $100,000 payment from petitioner—resulting in a total award to him of about $428,223 ($160,223 + $168,000 + $100,000). Consequently, out of the aggregate marital estate of

---

[1]Testimony established that the value of the contributions already made to the plan at the time of trial would be $336,000 when distributed. That amount was then discounted by $3\frac{1}{2}\%$ a year to arrive at the $207,613 present value. Since the entire $207,613 had accrued during the marriage, the figures provided in petitioner's brief, which are based on application of the formula to be used at the time of distribution to more precisely separate the marital benefits from those which accrued after dissolution, are incorrect.

more than $900,000, it appears that petitioner and respondent will ultimately receive approximately 55% and 45% of the assets, respectively—the disposition envisioned by the trial court.

Of course, the actual dollar amounts herein calculated are subject to modification because of such variables as the number of years respondent remains a participant in the plan and the rate of interest paid thereon; however, since the accrued benefits were already valued in excess of $200,000 as of December 1980, the rate of interest which was applied for purposes of computation was a conservative 3½%, and because testimony established that a recent surge in interest rates had caused the entire plan to be about $1,200,000 over-funded at the time of trial, it is our view that the amounts ultimately received by the parties will be less than those estimated; indeed, we believe, as did the trial court, that the actual distribution will be greater than herein estimated. Moreover, regardless of the precise amount each party will eventually receive, the proportionate decrease in petitioner's share and the increase in respondent's share due to repayment of the tax debt will remain the same.

Having determined that the trial court properly considered all relevant factors before deciding on a 55/45% apportionment, and because it appears that the distribution method set forth in the judgment will ultimately accomplish its intended division, we find no abuse of discretion by the trial court in its resolution of the property distribution.

■■ Nevertheless, we have also considered and find some merit in respondent's argument, premised on his assertion that the marital residence was undervalued, that the outright award thereof will result in an inequitable division of property if it is sold for an amount higher than the value ascribed to it by the trial court. In the light of our findings that the equity of the judgment was based in part on the $390,000 valuation of the apartment, which we have already determined was supported by the evidence, it appears to us that in order to maintain that equity, respondent should be awarded an interest in the home which corresponds to his interest in the entire marital estate. (See *In re Marriage of Cabaj* (1983), 118 Ill. App. 3d 789, 455 N.E.2d 822.) Accordingly, we modify the judgment to provide that if the cooperative apartment is sold during respondent's lifetime, he shall be allowed a lien of 45% upon the net proceeds of any amount over $390,000 that is realized from the sale. We believe that this order will best serve the interests of all concerned. Petitioner will be free to remain in the apartment for as long as she chooses, and the minor child who still lives there with

her will be afforded the maximum degree of continuity in his environment as is possible under the circumstances (see *In re Marriage of Brenner* (1981), 95 Ill. App. 3d 100, 419 N.E.2d 400); however, if she determines, for whatever reason, that it would be more advisable for her to sell it, she will not be at the mercy of whatever housing market conditions exist at the time (as she would be under the forced-sale order respondent urges us to issue) but would be able to assess the market conditions and hopefully make a well-reasoned decision as to the timing of the sale, which would inure to the benefit of both parties.

Respondent next contends that the trial court abused its discretion in ordering him to pay $5,000 per month permanent, unallocated maintenance and child support, arguing that the award is excessive in both amount and duration.

▮ Section 504 of the Act provides that the trial court may issue a maintenance order only if it finds that the spouse seeking it lacks sufficient property to provide for her reasonable needs, and is either unable to support herself through appropriate employment or is otherwise without sufficient income. (Ill. Rev. Stat. 1981, ch. 40, par. 504(a).) The Act further provides that the amount and duration of an appropriate maintenance award shall be "as the court deems just" after consideration of all relevant factors including the financial resources of the party seeking maintenance and her ability to meet her needs independently (Ill. Rev. Stat. 1981, ch. 40, par. 504(b)(1)); the time necessary to acquire sufficient education or training to enable her to find suitable employment (Ill. Rev. Stat. 1981, ch. 40, par. 504(b)(2)); the standard of living established during the marriage (Ill. Rev. Stat. 1981, ch. 40, par. 504(b)(3)); the duration of the marriage (Ill. Rev. Stat. 1981, ch. 40, par. 504(b)(4)); the age, physical and emotional condition of both parties (Ill. Rev. Stat. 1981, ch. 40, par. 504(b)(5)); the ability of the spouse from whom maintenance is sought to meet his needs while yet meeting those of the recipient spouse (Ill. Rev. Stat. 1981, ch. 40, par. 504(b)(6)); and the tax consequences of the property division (Ill. Rev. Stat. 1981, ch. 40, par. 504(b)(7)). The propriety of a maintenance award, as well as the amount and duration thereof, are matters which lie within the discretion of the trial court, for whose judgment we will not substitute our own absent an abuse of that discretion which occurs "only where no reasonable man would take the view adopted by the trial court." (*In re Marriage of Johnson* (1982), 106 Ill. App. 3d 502, 508, 436 N.E.2d 228, 232.) Although the trial court is not required to make express findings of fact in support of its determination that

maintenance is appropriate (*In re Support of McGrew* (1980), 90 Ill. App. 3d 27, 412 N.E.2d 996), here, the trial court specifically found that petitioner did not possess sufficient liquid assets or marketable skills to provide for her and the childrens' needs, the amount of which respondent did not challenge; that respondent's earnings were adequate to meet the expenses of both parties; that petitioner's deteriorating health, another matter which was unchallenged by respondent prior to this appeal, her child-rearing responsibilities, limited education, and long absence from the job market were all factors which militated against her being able to support herself, either now or in the future, at a level consistent with or even a reasonable approximation of the standard of living established during the marriage, and stated, "[T]his is clearly a case for permanent maintenance."

Although respondent concedes that petitioner is entitled to some maintenance and that he has the ability to pay a "just amount," he nevertheless asserts that the current award is excessive because it is based on unreasonable needs and that the trial court erroneously failed to require petitioner to "adjust her situation to make some provision for her own support at some future time." Once again, we note that respondent made no objection to the list of expenses—totaling $4,850 per month—submitted by petitioner at trial, and in fact had suggested $4,500 per month at a hearing held a few months before entry of the amended judgment when the trial court was considering his petition to reduce maintenance from the previously awarded $7,000 per month. He explained in arguments before us that this suggestion was predicated on his expectation of a more equitable property distribution and coupled with a specific request that petitioner be required to contribute $5,000 per year toward the $15,000 annual educational expenses of the children which he had been ordered to pay; however, our review of the record reveals no such request, and in view of the fact that respondent suggested $4,500 and that the award was thereafter reduced from $7,000 to $5,000 per month, we do not believe that the trial court acted arbitrarily. Furthermore, we note that the support award is unallocated; thus, the payment of $5,000 per month is deductible from respondent's adjusted gross income and taxable to petitioner. It is apparent, then, that while he will receive a tax benefit from the structure of this award, petitioner will experience a deficit each month (the difference between her unobjected-to expenses of $4,850 and her net after taxes on the $5,000 maintenance award).

In any event, respondent acknowledges that the principal aspects

of his argument are: that the expenses attendant to petitioner's remaining in the marital residence are unaffordable now that the parties are maintaining two households; that there is no necessity for her to remain there; that it is in the best interests of all that the sale of the apartment be ordered, if not now then no later than upon emancipation of the youngest child; and that upon such sale, the proceeds should be equitably divided, thereby balancing the overall property distribution and providing petitioner with sufficient capital with which to purchase a more affordable residence and an additional source of income from the surplus, as well as drastically reducing the monthly expenses of both parties.

■■■ Having previously outlined our views on the inadvisability of a forced sale of the apartment in our discussion and modification of the property division, we need not belabor the points made therein; however, we additionally note that although the issues of property division and maintenance are interrelated (*In re Marriage of Amato* (1980), 80 Ill. App. 3d 395, 399 N.E.2d 1018), and while the trial court must consider the financial resources of the spouse seeking maintenance in determining her ability to meet her needs independently (Ill. Rev. Stat. 1981, ch. 40, par. 504(b)(1)), it is well settled that she is not required to sell her assets or impair her capital in order to generate income from which she can support herself in the manner enjoyed during the marriage (*In re Marriage of Thornton* (1980), 89 Ill. App. 3d 1078, 412 N.E.2d 1336). Furthermore, respondent's repeated assertion that petitioner could easily find a suitable replacement residence for $100,000 is unpersuasive in that it is based on pure speculation and is unsupported by any evidence. Thus, we find no abuse of discretion in the trial court's award of $5,000 per month permanent, unallocated maintenance and child support.

Moreover, given the generally agreed likelihood that petitioner will eventually sell the apartment, we note that there is nothing which would bar respondent from then petitioning the court for a reduction of the maintenance award based on a decrease in petitioner's expenses, or on any other substantial change in the respective financial circumstances of the parties (Ill. Rev. Stat. 1981, ch. 40, par. 510(a); *In re Marriage of Lukas* (1980), 83 Ill. App. 3d 606, 404 N.E.2d 545), including the fruition of the previously discussed tax liabilities or the emancipation of the two minor children. Thus, unlike the order pertaining to the division of property, the issue of maintenance is one which may be reconsidered if and when circumstances warrant modification.

Respondent's final contention is that the trial court abused its discretion in ordering him to pay $60,000 for petitioner's attorney fees. He argues that the fees were excessive because they involved duplicative and unreasonable charges; that the trial court acted arbitrarily in failing to recite a basis for its award; and that the petitioner did not establish her inability to pay a portion thereof.

██ ██ Under section 508 of the Act, the trial court may, after considering the financial resources of the parties "order either spouse to pay a reasonable amount for his own costs and attorney's fees and for the costs and attorney's fees necessarily incurred by the other spouse ***." (Ill. Rev. Stat. 1981, ch. 40, par. 508(a).) The propriety of an award of fees is dependent upon a showing by the party seeking them of an inability to pay and a demonstration of the ability of the other spouse to do so (*In re Marriage of Sevon* (1983), 117 Ill. App. 3d 313, 453 N.E.2d 866); however, it is not necessary for the spouse seeking the fees to divest her capital assets (*In re Marriage of Smith* (1981), 100 Ill. App. 3d 1126, 427 N.E.2d 1262), deplete her means of support, or undermine her economic stability (*In re Marriage of Bentivenga* (1982), 109 Ill. App. 3d 967, 441 N.E.2d 336) in order to pay them. Once an award of fees is deemed appropriate, the trial court must then determine what amount is reasonable by considering the skill and standing of the attorneys employed, the nature and complexity of the issues involved, the time and labor required, the usual and customary charge in the community; and the benefits of the results achieved. (*In re Marriage of Thornton* (1980), 89 Ill. App. 3d 1078, 412 N.E.2d 1336.) Furthermore, the allowance of fees and the amount thereof are matters within the discretion of the trial court, and as with any discretionary matter under the Act, its decision will not be reversed unless there is a clear abuse thereof. *In re Marriage of Brophy* (1981), 96 Ill. App. 3d 1108, 421 N.E.2d 1308.

██ First, with respect to the issue of the financial resources of the parties, we note that the trial court's determination that petitioner was financially unable to pay her counsel and that respondent did have the ability to do so was predicated upon the same findings which served as the basis for its award of maintenance and do not bear repeating in detail here. Suffice it to say, that petitioner's only source of income—the $5,000 per month maintenance and child-support allowance—out of which she must pay taxes as well as her undenied itemized monthly living expenses, is inadequate to also cover the costs and fees incurred during this litigation. Conversely, respondent's gross income of about $200,000 per year, while signifi-

cantly reduced by maintenance payments, other family support obligations, and contributions to his pension plan, appears to be sufficient to absorb these costs.

In regard to respondent's assertion that because petitioner was represented by two attorneys from different law firms, it logically follows that the total award contains duplicative and thus unreasonable charges, we note that the trial court conducted a comprehensive hearing on the issue of attorney fees, wherein both of petitioner's attorneys testified and were cross-examined as to the bases for the amounts of fees sought in their petitions—which totaled more than $95,000. After reviewing those petitions and considering the testimony, the court then discussed the factors set forth under section 508 and determined that the attorneys were both highly qualified in their field; that the issues involved in the case were fairly complex; and that their rates were not unusually high. The court acknowledged, however, that there may have been some duplication of work between petitioner's attorneys and subsequently disallowed approximately $35,000 of the total fee requests. Absent evidence by respondent of specific instances of additional duplication or unreasonable expenditures of time by the attorneys involved, which he did not provide, or a request for a specific allocation of those fees, which he did not make, we cannot say that the trial court's award constituted an abuse of discretion.

For the foregoing reasons, the order of the trial court is affirmed as modified.

Affirmed as modified.

MEJDA, P.J., and LORENZ, J., concur.