*In re* MARRIAGE OF ELOISE F. OLSON, Petitioner-Appellee, and THOMAS R. OLSON, Respondent-Appellant.

Second District   No. 2—91—0132

Opinion filed January 9, 1992.—Rehearing denied February 21, 1992.

Joel D. Arnold, of Fortunato, Farrell & Davenport, Ltd., of Westmont, for appellant.

John Panegasser and Jeanne E. Galvin, both of Caluwaert, Panegasser, Hancock & Schousen, of Elmhurst, for appellee.

JUSTICE NICKELS delivered the opinion of the court:

After trial, the circuit court of Du Page County granted the petition of Eloise Olson (Eloise) for an order of dissolution of marriage and, as part of that order, made findings and entered orders determining the value and dissipation of the parties' closely held corporation, Quadro Enterprises, Inc. (Quadro), allocating the marital property and establishing the amount of child support (Ill. Rev. Stat. 1989, ch. 40, par. 401 *et seq.*). Thomas Olson (Thomas) appeals those orders and asserts nine issues: (1) whether the trial court not only erred in permitting Eloise's valuation expert to testify, but whether the court's acceptance of such valuation was against the manifest weight of the evidence; (2) whether the court's finding of dissipation of marital assets was against the manifest weight of the evidence; (3) whether the court erred in including certain assets in the marital estate; (4) whether the court's allocation of marital assets was an abuse of discretion; (5) whether the court erred in requiring Thomas to pledge his individual retirement account (IRA) as security for Thomas' payment of the cash portion of the marital estate due to Eloise; (6) whether the court's requirement that Thomas name or maintain Eloise as a trustee on life insurance policies for the benefit of the parties' two sons and as co-owner and cobeneficiary of policies on the lives of the parties' sons was error; (7) whether the amount of the award of child support was an abuse of discretion; (8) whether the court erred in entering an order apportioning the cost of future college education of the parties' two 17-year-old sons; and (9) whether the court's failure to allocate the marital debt, with the exception of eventual capital gain tax liability on the sale of the marital home, was error.

On April 1, 1988, Eloise petitioned for dissolution of the marriage on grounds of adultery and mental cruelty. Thomas agreed to stipulate to grounds of mental cruelty on the first day of the trial, which thereby removed any issue of adultery from the trial. However, Eloise had further specifically alleged that between 1986 and 1988 Thomas had dissipated Quadro, the parties' closely held corporation, in paying a draw, commissions, and various personal expenses to an independent contractor, Theresa Bronkema Slater (Theresa), who was

Thomas' alleged paramour. The parties agreed to a valuation date of July 31, 1989, for all marital assets, including Quadro.

The parties were married on March 15, 1969. In 1974, twin boys, Garrett and Darren, were born. The boys participated extensively in tennis tournaments, the expenses relative to which Thomas volunteered to assume. At the time of trial, Eloise was 46 years old, and Thomas was 48 years old.

An injunction prevented either Thomas or Eloise from disposing of marital property pending distribution by the court. Therefore, both parties continued to reside in the marital residence in Hinsdale, which was offered for sale at the time of trial. By court order, Thomas and Eloise shared equally all household expenses after Eloise filed her petition on April 1, 1988.

Prior to forming Quadro in 1983, Thomas was employed as a vice-president of marketing and sales by a similar company, where he earned $98,783 in 1982. Thomas' tax returns for 1988 and 1989 reflected earnings of $80,141 and $75,331, respectively, and his annual salary at the time of trial was $66,000. Eloise was employed by Official Airline Guides with an annual income of almost $49,000.

Quadro is an advertising or promotional specialties wholesaler. It essentially provides promotional items to its customers, who in turn offer them to prospective customers to encourage business or to sales employees as incentives for obtaining business. Calculators, pens, and other similar items are typical products that Quadro merchandises. T.J. Distributing (T.J.) was a formally recognized division of Quadro, and Gifts that Grow, although unofficial, was also treated as a separate division.

Initially, Quadro operated as an independent representative of the producers of promotional products, and its income was principally derived from commissions. However, in 1986, Quadro evolved and began purchasing products through its T.J. Distributing division. Quadro paid for such products and invoiced its customers, so that its income was principally derived from the excess of its sales over its cost of sales. Gifts that Grow differed from Quadro's other programs because Quadro sold gift certificates, which were later redeemed for nursery products.

Quadro maintained no inventories, but rather had its vendors ship all merchandise directly to its customers. Quadro operated on a cash basis with a fiscal year end of January 31. Wolf and Company, Quadro's accountants, then compiled its financial records from documents supplied by Thomas and prepared Quadro's tax returns.

Thomas was Quadro's president, sole shareholder, and, as of the valuation date, its sole employee. Quadro's business had been conducted

from the marital home, but was relocated to an office complex during the pendency of this action at which time an office manager was hired. Eloise participated in the business and performed computer work for Quadro, for which she was paid sums that the parties agreed were non-marital funds.

In addition to Thomas' sales efforts, Quadro merchandised products through independent contractors. In May 1986, Thomas hired Theresa Bronkema Slater as an independent contractor. Theresa was paid $1,000 per month as draw against commissions. On two occasions, once in 1987 and once in 1988, Theresa was paid an additional month's draw without explanation. In addition to her sales efforts, Thomas testified that Theresa performed administrative work two to three days a week at Quadro's office located in the parties' home, although she then resided in Rockford. In 1986, Theresa was provided with a 1984 Lincoln as a company car. All repairs, insurance, and gas were paid by Quadro. No other independent contractor was provided an auto. Thomas attended six to eight trade shows yearly, and Theresa accompanied Thomas on four to six of such trips. Both Theresa and Thomas, as well as occasionally another individual who was promoting one of Quadro's lines, occupied the sales booth during the shows, answering questions and distributing literature. Theresa shared Thomas' hotel suite on such trips. Other expenses paid either by Quadro or by Thomas and reimbursed to him by Quadro included the travel expenses of the trade shows, modeling photos of Theresa both with and without Quadro products, a modeling composite for Theresa, Theresa's moving expenses when she relocated from Rockford to Bolingbrook, furniture and draperies for Theresa's apartment in Bolingbrook, and expenses for the Sybaris, which is an adult motel in the Chicago suburbs.

Eloise retained Daniel Anderson as an expert to testify at trial and give an opinion of the value of Quadro, to which Thomas objected asserting that Anderson was not qualified. Anderson had practiced as a CPA since 1974 and additionally was certified as a financial planner since 1988. Anderson had previously conducted two or three other business evaluations and was in the process of completing yet another. Anderson, however, had not testified as an expert. Rather, on one occasion he had testified as to the methodology of the evaluation, and in another his testimony had been unnecessary because the case settled. However, he had rendered opinions as to the value of businesses, although not at trial. Anderson had no formal evaluation training. However, he reviewed and applied the formula for valuation of intangible assets set out in the publication recommended by the Illinois CPA Society, as well as consulting with its author, Arthur Crandall, who was a

well-known expert in the area. Anderson had never written any treatises, nor lectured on the subject of evaluating businesses. Over Thomas' objection, the court found that as a CPA Anderson was a qualified expert and that his limited experience or formal evaluation training went only to the weight the court would give his testimony.

Anderson's opinion was based entirely on documents supplied by Wolf and Company, which was not only Quadro's accountants but also Thomas and Eloise's accountants during the marriage. Such documents had in turn been supplied to Wolf and Company by Thomas. Quadro operated on a cash basis, and Wolf and Company, based on the documentation supplied by Thomas, converted Quadro to an accrual basis and compiled Quadro's operating statements and tax returns each year at the end of Quadro's fiscal year on January 31. However, because the valuation date was July 31, 1989, no compilation had been done for the six-month period from February 1, 1989, to July 31, 1989. Therefore, Anderson performed the compilation from documents provided pursuant to discovery requests and court order by Thomas to Wolf and Company, and in turn to Anderson. The February 1, 1989, through January 31, 1990, compilation remained unfinished at the time of trial in May 1990 because Wolf and Company had been occupied with preparation for the trial and had obtained an extension in which to file Quadro's tax return. In addition to requesting generally all receipts, records, expenses, and documents, Anderson had specifically requested accounts payable relative to the Gifts that Grow division and was told by Wolf and Company that there were none. In preparing his compilation, Anderson did not consult with Thomas because he had been instructed to liaison through Wolf and Company.

Anderson's opinion of the value of the tangible assets of Quadro was as follows:

| | |
|---|---|
| Cash | $2,856 |
| Accounts receivable—trade | 135,302 |
| Accounts receivable—T. Olson | 10,200 |
| Prepaid insurance | 793 |
| Furniture, equipment | 49,488 |
| TOTAL ASSETS: | $ 198,639 |
| Accounts payable | $30,660 |
| State withholding tax | 138 |
| Sales tax payable | 727 |
| Notes payable—auto | 29,641 |
| TOTAL LIABILITIES | $ 61,116 |
| NET TANGIBLE ASSETS | $ 137,473 |

In addition, using Crandall's formula method for valuing excess earnings of a corporation over other similar companies in the same industry, Anderson valued Quadro's intangible assets at $348,887.

In contrast, Robert Potoker of Wolf and Company testified as Thomas' valuation expert. Potoker was also a CPA and an associate member of the American Society of Appraisers studying to become a full member. Potoker's principal duties with Wolf and Company were to value businesses, but generally for purposes other than dissolution. He had valued between 75 and 100 small businesses and had testified as an expert on many occasions. Potoker had attended one of Arthur Crandall's courses on business valuation, but had not himself lectured on the subject. Wolf and Company conducted an in-house seminar on valuation, an outline for which Potoker cursorily reviewed prior to its use. Although Eloise objected to Thomas' use of an expert from Wolf and Company, the court found Potoker to be unbiased.

Potoker and Anderson agreed that Quadro had cash of $2,856, which was the net of negative balances in the T.J. and Quadro checking accounts against the balance of the Gifts that Grow account and the T.J. money market account of $9,734. Potoker initially valued Quadro's tangible assets at $36,204. However, both Anderson and Potoker, in response to information gleaned from the other's valuation report, prepared revised reports with corrections.

Anderson's revised opinion, which was not submitted to the court except as evidence of the weight to be given Anderson's initial opinion, was that Quadro had net tangible assets of $137,223, based on a $250 correction to the value of Quadro's furniture and equipment. Anderson also corrected his estimate of Quadro's intangible assets, correcting a mathematical error and substituting the 1989 comparable rates that were unavailable to Anderson at the time of his original report.

Potoker's revised opinion increased his valuation of Quadro to $51,000 and was submitted to the court as evidence of Quadro's value. The discrepancies were in essentially four key areas: (1) additional trade payables of $39,000 related to the Gifts that Grow division; (2) nontrade accounts payables of almost $12,000; (3) $12,700 shareholder receivable treated as personal income to Thomas by Potoker; and (4) additional total tax liabilities of $28,000, specifically $9,899 in Illinois sales tax and $2,862 in penalties per an August 1990 audit, $2,110 sales tax invoiced to a customer but not correctly offset by a corresponding payable, and an estimated $14,000 income tax for the period ending July 31, 1989.

During their testimonies, both Anderson and Potoker were presented with hypothetical facts, which, if true, would have changed their valuations. Specifically, Anderson admitted that if Gifts that Grow had payables, such liability would reduce his valuation. A similar hypothetical with regard to tax liabilities produced the same hypothetical result. However, Anderson repeatedly testified that Thomas, through Wolf and Company, failed to produce such documentation when requested, and Potoker admitted that the sales tax liability was a proposed amount based on an audit completed during the middle of trial.

At the time of his testimony, Potoker had no present recollection of the July 31, 1989, bank statement for the T.J. money market account, which reflected a balance of more than $19,000 but admitted that hypothetically such balance should have been included in Quadro's cash. However, the financial statements admitted into evidence and used by both Potoker and Anderson indicated that the actual balance of $9,734, which was the net of the July 31, 1989, statement and two July checks for $5,000 each that had not cleared in July, was in fact included in Quadro's cash.

In addition to the mortgage balance remaining on the marital home of $170,598 and a loan on Eloise's car of $8,452, which were the only long-term debts, Thomas submitted evidence of short-term marital expenses totaling $17,877 as follows:

| | |
|---|---|
| Past-due mortgage—(July & August 1989) | $3,683 |
| Past-due real estate taxes—(1989) | $5,288 |
| Misc. tennis expenses of the children | $3,411 |
| Medical expenses—children | $244 |
| Life insurance premiums—children | $100 |
| Insurance premium—house | $215 |
| Household expenses | $754 |
| Revolving credit | $4,182 |

With the exception of the mortgage and real estate tax arrearages, however, all of these expenses were 1990 expenses. At the close of the trial on August 9, 1990, the court ruled on Eloise's prior emergency motion to use marital funds to pay her share of outstanding mortgage payments and ordered Thomas to pay all of the July and August payments from Quadro funds. Further, the court ordered that the 1989 real estate taxes be paid from the proceeds of the sale of the parties' Pine Grove condominium, which was a marital fund, subject to possible reimbursement at the time of final distribution.

After considering the parties' written closing arguments, the court noted that it found both experts' valuation suspect based on the

difficulty in obtaining documents and was keenly aware that the experts' opinions were based on records and information supplied by Thomas, about whose forthrightness the court had considerable reservations. The court expressly declined to comment specifically on the credibility of either parties' expert witness. However, the court noted that although Potoker was unbiased and that the court did not look on his testimony unfavorably, the court was disturbed by Potoker's apparent lack of knowledge of the T.J. money market account. The court recognized the use of the Crandall formula for valuing intangible assets as a means to account for income stripping in a closely held corporation such as Quadro and expressly found that abundant evidence of such stripping was presented. However, based on Potoker's testimony that Quadro possessed no goodwill absent Thomas' unique individual efforts, the court rejected Anderson's estimate of Quadro's intangible assets. The court accepted Anderson's value of Quadro's tangible assets of $137,473 as more accurate and, further, increased such value by $19,000 to account for the T.J. money market account believing it to have been omitted from both valuations.

The court found both that there was evidence that Theresa had done some work for Quadro and that Thomas' payments to Theresa through Quadro had been an obvious subterfuge. Therefore, the court allowed the commissions paid to Theresa, as well as her expenses for lodging and meals while working at the trade shows and other unidentified expenses, as directly related to the work she performed for Quadro, but found that all other payments totaling $30,151.68 had been dissipation of marital assets as follows:

| | |
|---|---|
| Draw | $25,500.00 |
| Air fare | $296.00 |
| Modeling expenses | $3,161.53 |
| Sybaris | $257.00 |
| Moving expense | $1,093.19 |
| Furniture and drapes | $843.36 |

Because the court was unable to determine the amount of dissipation relative to the car provided Theresa, it instead considered it a factor in its eventual distribution of marital property.

The court found the parties' total marital property to be $532,702, including Quadro valued at $137,473, dissipation of $30,152, the money market account of $19,000, and the Pine Grove condo sale account of $5,238. The court awarded Eloise 61% of the parties' property including proceeds of the equity in the marital home, her IRAs and pension plan subject to a loan, her car subject to a loan, and $50,000 cash to be paid over three years at 8% inter-

est and secured by Thomas' IRA account. The court awarded Thomas 39% of the marital property, including Quadro, his IRAs, the $19,000 money market account, and the $5,238 Pine Grove condo sale account.

Thomas was ordered to pay child support of $1,500 per month, based on the court's determination that he was capable of earning $100,000 per year. The court rejected Thomas' claim of only $5,500 gross salary per month based on the evidence of personal expenses paid on Thomas' behalf by Quadro and not reflected in Thomas' salary. Thomas was ordered to pay 75% of his sons' future college or trade school education, after exhaustion of all grants of scholarships, and to name Eloise as a cobeneficiary and co-owner on the life insurance policies that Thomas owned on the parties' sons, with each party paying one-half of the cost. In addition, the court ordered Thomas to name Eloise as trustee on Thomas' own life insurance policies for the benefit of the children until their completion of college or emancipation. Finally, the court determined that the parties should equally share any capital gains liability from the proceeds of the sale of the marital home and each assume any debts individually incurred by them since April 1, 1988.

Thomas now appeals, asserting nine errors. First, Thomas asserts that the trial court erred in allowing Anderson to testify as an expert and that the court's acceptance of Anderson's valuation of Quadro's tangible assets was against the manifest weight of the evidence.

The trial court is vested with broad discretion in making the initial determination of whether a witness is qualified to testify as an expert. (*Schaffner v. Chicago & North Western Transportation Co.* (1989), 129 Ill. 2d 1, 36; *Valiulis v. Scheffels* (1989), 191 Ill. App. 3d 775, 785.) A party must show that the witness has specialized knowledge or experience in the area about which the witness is to offer an expert opinion. (*Schaffner*, 129 Ill. 2d at 36; *Valiulis*, 191 Ill. App. 3d at 785.) Such knowledge may be based on practical experience, scientific training, or academic training, and need only be knowledge beyond that of an average person. *Schaffner*, 129 Ill. 2d at 36; 134 Ill. 2d R. 220(a)(1).

▉ Anderson was a CPA with 15 years of auditing and accounting experience, which is a specialized area normally beyond the knowledge of an average person and one in which the trial court expressly noted its lack of knowledge. Anderson had both formal academic training and practical experience in the area of accounting, which is essentially all that is involved in a valuation. In addi-

tion, Anderson had on several occasions valued medical practices for purposes of dissolution of marriage proceedings, although he had not testified in those proceedings at the time of this trial. Such medical practices, which are based on an individual's professional skills, closely parallel Quadro, based on Thomas' unique individual skills.

Thomas' argument that specific experience or training in valuation is necessary is without merit because valuation is merely a small part of the larger discipline of accounting. So, too, we find disingenuous Thomas' argument that experience testifying is necessary to be qualified as an expert witness. The act of testifying does not create the specialized knowledge of an expert witness, but rather the education, training or practical experience gained prior to testifying render a witness qualified to offer an expert opinion. Finally, we note that much of Thomas' argument goes to that portion of Anderson's opinion that the court rejected: the value of Quadro's intangible assets. Neither party on appeal disputes the correctness of that portion of the court's determination, and Thomas' assertions of such flaws are, therefore, not relevant on this appeal. The trial court's determination that Anderson was qualified as an expert and that his limited experience in valuation proceedings went only to the weight of his testimony was not an abuse of discretion.

■ Thomas also contends, however, that the court's acceptance of Anderson's valuation of $137,473 for Quadro was against the manifest weight of the evidence. Precise rules for determining the value of closely held stock cannot be laid down, but rather all evidence reflecting the worth of the entity should be considered. (*In re Marriage of Rossi* (1983), 113 Ill. App. 3d 55, 61; *In re Marriage of Mitchell* (1981), 103 Ill. App. 3d 242, 248.) Both the future economic outlook and the capitalization of future earnings are important tools for valuing a closely held corporation. (*Rossi*, 113 Ill. App. 3d at 60.) Conflicts in testimony regarding the value of marital assets in an action for dissolution are matters for the trier of fact, and a valuation within the range testified to by the parties' experts will not be disturbed on review. *In re Marriage of Stone* (1987), 155 Ill. App. 3d 62, 71 (marital home); *In re Marriage of Weinberg* (1984), 125 Ill. App. 3d 904, 910 (co-op marital apartment).

Thomas asserts that the court failed to consider several apparent errors in Anderson's valuation of Quadro's tangible assets, which created the discrepancy between Anderson's and Potoker's

valuations. However, the court expressly found Thomas' credibility suspect and, further, that both valuations were based on information supplied by Thomas. As a result, the court found that both Anderson's and Potoker's valuations were suspect. The court specifically found that there had been abundant evidence of income stripping, which it did not account for via the recognized capitalization of earning method. Thus in its order, the court considered all the evidence specifically including factors compensating for the alleged errors in Anderson's valuation. In light of its assessment of Thomas' credibility, the court was free to choose to accept Anderson's valuation, despite its flaws, as a more accurate reflection of Quadro's true value. Specifically, the court was free to reject Thomas' testimony that the Gifts that Grow program would generate future accounts payable liabilities or the existence of other unsubstantiated nontrade payables. So, too, the court was equally free to refuse to reduce Quadro's value based on projected tax liabilities or misclassified shareholder receivables in light of the court's perception that there had been abundant evidence of income stripping. Thus, the trial court's determination that Quadro had a value of $137,473 on July 31, 1989, was within the range of values of $51,000 and $486,360 testified to by the experts and was not against the manifest weight of the evidence.

■ Thomas next alleges that the court erred in finding a dissipation of Quadro because the court specifically found that Theresa had performed some work. Alternately, Thomas argues that the court incorrectly determined the amount of dissipation in failing to allow the modeling expenses incurred in which Theresa modeled Quadro products.

Dissipation occurs if one spouse uses marital property for his or her own benefit during a period when the marriage was in the process of irrevocable degeneration. (*In re Marriage of O'Neill* (1990), 138 Ill. 2d 487, 497; *In re Marriage of Smith* (1984), 128 Ill. App. 3d 1017, 1019; Ill. Rev. Stat. 1987, ch. 40, par. 503(d)(1).) The spouse charged with dissipation must establish by clear and specific evidence that the funds were not inappropriately spent. (*Smith*, 128 Ill. App. 3d at 1022.) General or vague statements that funds were spent for marital purposes are insufficient. (*Smith*, 128 Ill. App. 3d at 1022.) Compensation paid to third parties is dissipation if it is inconsistent with such compensation paid to others with similar skills for similar work. *In re Marriage of Calisoff* (1988), 176 Ill. App. 3d 721; *In re Marriage of Aud* (1986), 142 Ill. App. 3d 320, 332.

Theresa was an independent contractor and paid a draw of $25,500 against commissions of $5,205, which overpayments were never adjusted. Theresa was paid duplicate draws without any attempt to collect the excess payments. Thomas, through Quadro, provided Theresa with a company automobile, including insurance, repairs, and gas. No other independent contractor was similarly compensated. Thus, it is clear that the payment of draws and the provision of a company car were compensation inconsistent with that provided others with similar skills performing similar duties. (See *Aud*, 142 Ill. App. 3d at 332.) Nor was Thomas' payment of Theresa's moving expenses and his purchase of furniture and draperies related in any way to her duties for Quadro. Finally, Thomas' payment of charges for the Sybaris, an adult motel located near his home, cannot reasonably be argued to bear any relation to Quadro's business. In light of the ample evidence of dissipation, the inadequacy of Quadro's records, and the court's assessment of Thomas' lack of credibility, we also find no merit in Thomas' argument that some portion of the modeling expenses he paid were for the benefit of Quadro. We note that the court expressly found that the dissipation was greater than that allowed due to the automobile provided Theresa. Thus, the court's determination of the amount of dissipation was supported by all the evidence and was not an abuse of discretion.

Both Thomas' third and fourth alleged errors concern the court's distribution of the marital estate, which Thomas asserts was an abuse of the court's discretion. However, an appellate court will only find an abuse of discretion in apportioning marital property where no reasonable person would have adopted the court's decision. (*In re Marriage of Hanson* (1988), 170 Ill. App. 3d 298.) A court is not, however, bound to make an equal division but rather only one that is in just proportion. (*Weinberg*, 125 Ill. App. 3d at 913; *In re Marriage of Lloyd* (1980), 81 Ill. App. 3d 311.) Only if such distribution results in substantial injustice will a reviewing court find an abuse of discretion. (*Weinberg*, 125 Ill. App. 3d at 913.) Factors to be considered include the contribution or dissipation of each party in the acquisition and preservation of the marital property and the reasonable opportunity of each spouse for future acquisition of assets and income. (Ill. Rev. Stat. 1987, ch. 40, pars. 503(d)(1), (d)(10).) In addition, a court must also consider: the value of nonmarital property; the duration of the marriage; the relevant economic circumstances of each spouse when the property division is to take effect; the age, health, occupation, amounts and sources

of income, skills, employability, estate, liabilities, and needs of each spouse; the custodial provisions for any children; whether maintenance is to be awarded in lieu of or in addition to the property; and the tax consequences of the property division. Ill. Rev. Stat. 1987, ch. 40, par. 503(d) *et seq.*

■ The court awarded Thomas 39% and Eloise 61% of the marital estate based on the disparate ability of the parties to generate future assets and income. Although the court held that Eloise's inheritance of $50,000 was contributed to the marital estate as a gift, the court specifically considered Eloise's contribution of such funds in apportioning the estate. The court also specifically indicated that it considered the dissipation as a result of Thomas' providing a car to Theresa in the distribution of marital assets. Thus, the court's award was not so unreasonable as to be an abuse of discretion. *In re Marriage of Frazier* (1988), 164 Ill. App. 3d 207 (award of 79% of marital estate proper in light of wife's contribution of nonmarital property to marital estate and husband's ability to generate income).

Thomas further alleges, however, that the court's apportionment of the marital estate suffered from obvious accounting errors and such errors combined with the court's overvaluation of Quadro and the amount of dissipation resulted in an apportionment that was an abuse of discretion. Thomas' assertion loses much of its persuasion in light of our determination that the court did not err either in determining Quadro's value or in determining that a dissipation occurred and its amount. Nevertheless, we find errors in the court's accounting did occur, and we amend the judgment of the trial court to correct such errors. See 134 Ill. 2d R. 366.

The court awarded Thomas both the $19,000 money market account and the $5,238 Pine Grove sale fund. However, both Anderson's and Potoker's valuations began with a cash figure that included the money market, although at the correct balance of $9,734, which allowed for checks issued in July that had not cleared at the time of the July 31, 1989, statement introduced into evidence. Eloise's argument that such checks do not affect the value of the account on its July 31, 1989, valuation date ignores basic accounting as simple as balancing a checkbook. Thus, the marital estate was overstated by $19,000 and should have been valued at $513,702. In addition, the Pine Grove sale account had been used to pay the 1989 real estate taxes on the marital home by order of the court. In reducing the liabilities outstanding against the equity of the marital residence, the court effectively increased its value as

distributed to Eloise. To allow for these accounting errors, we reduce the $50,000 to be paid by Thomas to Eloise to $25,762. With these corrections, the percent of marital property awarded to Eloise returns to 61% as determined by the trial court to be appropriate under the facts of this case.

■■ Thomas next contends that the court erred in requiring him to pledge his IRA account to secure his payment of the cash award to Eloise. Tax consequences of a property distribution are one of the factors to be considered by the court in making a property distribution upon dissolution of marriage. (*In re Marriage of Malters* (1985), 133 Ill. App. 3d 168, 183; Ill. Rev. Stat. 1987, ch. 40, par. 503(d)(1).) However, speculative tax consequences are inappropriate for the court's consideration. *In re Marriage of Emken* (1981), 86 Ill. 2d 164, 167; *In re Marriage of Kapusta* (1986), 141 Ill. App. 3d 1010, 1017; *In re Marriage of Block* (1982), 110 Ill. App. 3d 864, 868.

In this instance, Thomas asserts that section 408 of the Internal Revenue Code (26 U.S.C. §408(e)(4) (1988)) renders the use of his IRA as security for the court's judgment a distribution and, thus, subject to both taxes and penalties. However, a judgment is distinct from a loan, and Thomas cites no authority to support his argument that use of his IRA as security pursuant to court order would be considered a taxable event by the Internal Revenue Service. Thus, Thomas' possible future tax consequences are speculative, and the trial court was not required to consider such potential liabilities.

■■ The sixth error raised by Thomas concerns both the life insurance policies on his life and on those of the parties' two sons. However, Thomas cites no authority for his argument that the court's order directing him to name Eloise co-owner and cobeneficiary on policies now owned by Thomas on the lives of the parties' two sons, and further ordering each to pay one-half of the cost of such policies, was error. We, therefore, do not consider that portion of Thomas' argument. 134 Ill. 2d R. 134; *Webb v. Angell* (1987), 155 Ill. App. 3d 848, 854.

In addition, Thomas asserts that the court was required to make a finding of special circumstances that a trust was necessary to protect and promote the best interests of the children before requiring Thomas to name Eloise as trustee for the benefit of their sons on Thomas' life insurance policies. (See *In re Marriage of Dulyn* (1980), 89 Ill. App. 3d 304, 311; Ill. Rev. Stat. 1987, ch. 40, par. 503(g).) However, as *In re Marriage of Dulyn* makes clear, the court could order such trust without a finding of special circum-

stances under section 510(c) of the Illinois Marriage and Dissolution of Marriage Act (the Marriage Act) (Ill. Rev. Stat. 1989, ch. 40, par. 510) to insure the fulfillment of the support obligation should Thomas die. (*Dulyn*, 89 Ill. App. 3d at 311-12.) In literally identical circumstances, the court in *Dulyn* held that an order requiring a husband to name his son as irrevocable beneficiary of the husband's life insurance policy did not require a finding of special circumstances in light of the husband's continuing obligation of support in the event of his death. (*Dulyn*, 89 Ill. App. 3d at 311-12.) Thus, the court did not err in requiring Thomas to name Eloise as trustee of Thomas' life insurance policies for the benefit of the parties' two sons until the completion of their college education or emancipation.

■ As his seventh error, Thomas asserts that the court abused its discretion is determining the amount of child support. The court found that in addition to Thomas' gross salary of $5,500, he received additional income from the personal expenses paid on his behalf by Quadro. The court, therefore, found that Thomas' net monthly income was $6,000 and ordered him to pay $1,500 per month in child support, which is the statutory guideline of 25% applicable for two children.

The amount of an award of child support is within the discretion of the trial court and will not be reversed absent a showing that the trial court abused such discretion. (*In re Marriage of Scafuri* (1990), 203 Ill. App. 3d 385, 391.) Analysis of the proper amount of child support begins with section 505 of the Marriage Act (*Scafuri*, 203 Ill. App. 3d at 391), which provides the trial court with guidelines for the minimum amount of child support to be awarded. (*In re Marriage of Steichen* (1987), 163 Ill. App. 3d 1074, 1080.) The statutory factors enumerated in section 505(a)(2) need not be considered unless the court deviates from the statutory guidelines. (*In re Marriage of Tatham* (1988), 173 Ill. App. 3d 1072, 1093.) Although a judge may not blindly rely on the guidelines and surrender responsibility for considering other relevant factors (*In re Marriage of Blaisdell* (1986), 142 Ill. App. 3d 1034, 1040), it is the parent seeking a deviation from the guidelines who bears the burden of presenting evidence justifying such diversion. (*In re Marriage of Rogliano* (1990), 198 Ill. App. 3d 404, 411.) Such deviation from the guidelines requires the court to make specific findings based on the consideration of section 505(a)(2) of the court's reasons for so doing. Ill. Rev. Stat. 1989, ch. 40, par. 505(a)(2); *Blaisdell*, 142 Ill. App. 3d at 1041.

As a prerequisite to determining the proper amount of child support, however, the court must first determine the noncustodial parent's net income (Ill. Rev. Stat. 1987, ch. 40, par. 505(a)(1)), which may be difficult to ascertain and an impediment to determining an award of child support. (*In re Marriage of Lefler* (1988), 185 Ill. App. 3d 677, 681.) If present net income is not ascertainable or uncertain, a court may consider past earnings. (*Block,* 110 Ill. App. 3d at 869; *In re Marriage of Butler* (1982), 106 Ill. App. 3d 831, 836-37.) The credibility and forthrightness of the noncustodial parent in disclosing income is a factor to be considered in accepting evidence of net income. (See *Lefler,* 185 Ill. App. 3d at 683.) Bimonthly payroll receipts for periods less than a year for a noncustodial parent with above-average income may not reflect true income because such partial records do not reflect increased income on reaching maximum FICA withholding. (*In re Marriage of Stockton* (1988), 169 Ill. App. 3d 318, 324.) Similarly, other options exercised at the discretion of the noncustodial parent may reduce the net income appearing on an isolated payroll receipt. *Stockton,* 169 Ill. App. 3d at 324.

We note initially that the court was not required to make specific findings because it did not deviate from the guidelines of the Marriage Act. Rather, the issue presented is more accurately whether the court abused its discretion in determining that Thomas' net monthly income was $6,000. The court had ample evidence that Thomas enjoyed more than the income reflected on his payroll receipts for the first six months of 1989. Anderson testified to over $22,000 per year in personal expenses paid by Quadro on Thomas' behalf, which Thomas' own expert testified should be treated as income personal to Thomas. Thomas' gross income in 1982, prior to starting Quadro and eight years prior to the trial, was $98,783. In 1988, his gross income was $80,141 plus expenses paid by Quadro. In 1989, his gross income was $75,331 exclusive of Quadro's payment of his personal expenses or any bonuses such as he paid himself prior to the filing of these proceedings in 1988. Thomas' payroll receipts neither reflected his election to forego such bonuses nor the additional income he enjoyed through Quadro. Finally, the court could consider Thomas' lack of forthrightness in assessing the weight to be given the evidence of his income. Thus, the court had ample evidence that Thomas enjoyed substantially more than the $5,500 in gross income to which he testified and did not abuse its discretion in finding that Thomas earned net income of at least $6,000 monthly.

■ Thomas next asserts that the court erred in ordering him to pay 75% of the cost of his two sons' college education costs. Thomas argues that the court failed to consider the financial resources of the parties or the cost of such education.

We are again governed by the standard of review as applicable to the court's apportionment of the marital estate of whether the court so abused its discretion that no reasonable person could agree with the trial court. (*In re Marriage of Albiani* (1987), 159 Ill. App. 3d 519, 526.) In determining parental responsibility for educational expenses, the financial resources of both parents, the child, and the standard of living of the child absent divorce must be considered (Ill. Rev. Stat. 1987, ch. 40, par. 513). Within such consideration, the cost of the education will necessarily be considered as well. *In re Marriage of Cooper* (1981), 102 Ill. App. 3d 872, 876-77; see also *Ingrassia v. Ingrassia* (1987), 156 Ill. App. 3d 483.

Thomas' argument ignores the court's clear statement that its order regarding college education expenses was based on Thomas' superior abilities to generate financial resources and was rendered within the context of its discussion of child support, to which the financial resources of the parties, children, and marital standard of living are applicable. So, too, Thomas' argument fails to grasp that the price of such education is material only relative to such financial considerations. Having found that the court properly considered the necessary factors, we cannot say that its determination that Thomas assume responsibility for 75% of the parties' sons' college education was an abuse of discretion.

■ Finally, Thomas asserts that the court failed to allocate responsibility for the parties' marital debts. This argument is simply not supported by the record. The court ordered Eloise to assume responsibility for her car loan, the loan against her profit sharing, individual debts incurred by her since the filing of her petition for dissolution, one-half the cost of the boys' life insurance, and one-half of the capital gains liability from the sale of the marital residence. The court ordered Thomas to assume responsibility for all liabilities of Quadro, his individual debts incurred since the filing, one-half the cost of the boys' life insurance, and one-half of the capital gains liability from the sale of the marital home. A prior court order had ordered the parties to share equally all household expenses incurred after April 1, 1988, the date on which Eloise filed her petition. Thomas testified that he voluntarily wished to assume all responsibility for the parties' sons' tennis expenses. No debts re-

main for distribution, with the exception of the balance of the mortgage on the marital residence.

However, both parties testified that the marital residence was to be sold and had in fact been listed for sale during the entire proceedings. Thus, Thomas' citation to precedent in which property, but not liabilities thereon, was awarded to one party who retained and used the property is not controlling. (See *In re Marriage of Guntren* (1986), 141 Ill. App. 3d 1, 7 (error to award actively used farm equipment to wife and liability thereon to husband).) Thus, we also dispose of Thomas' argument that the court erred in apportioning the capital gains liability from the sale of the marital home and awarding the equity in the home to Eloise.

With the exception of the trial court's accounting errors in including the T.J. money market account as an asset separate from Quadro and in failing to increase the value of the marital home by the reduced real estate tax liability, we find each of Thomas' asserted errors to be without merit. We modify the court's order of distribution of the marital estate and reduce the amount to be paid by Thomas to Eloise from $50,000 to $25,762 to correct this error.

The judgment of the trial court is affirmed as modified.

Affirmed.

DUNN and GEIGER, JJ., concur.