*In re* MARRIAGE OF JUDITH C. EDDY, Petitioner-Appellant, and J. MICHAEL EDDY, Respondent-Appellee.

First District (2nd Division)   No. 1—88—3615

Opinion filed March 5, 1991.

McDermott, Will & Emery, of Chicago (Sandra R. Murphy and Roger W. Wenthe, of counsel), for appellant.

Pierce, Yavitz & Eslick, Ltd., of Chicago (Dennis J. Eslick and Barry E. Yavitz, of counsel), for appellee.

JUSTICE DiVITO delivered the opinion of the court:

Petitioner Judith C. Eddy (Judith) appeals from portions of the circuit court's judgment granting the dissolution of her marriage to respondent J. Michael Eddy (Michael). Judith contends that the circuit court erred in (1) classifying certain business assets acquired by Michael during the marriage as his nonmarital property; (2) failing to reimburse the marital estate for Michael's uncompensated personal services, which allegedly substantially increased the value of a non-marital business; (3) failing to award Judith sufficient assets or maintenance; (4) assigning to the parties the responsibility for payment of their own litigation expenses without a hearing; and (5) imposing

sanctions against Judith's counsel for preparing an erroneous summary of business records.

Judith and Michael were married on June 28, 1958, and were the parents of two children, Sarah and Thomas. The dissolution of their marriage occurred on October 5, 1988. At the time of dissolution, Thomas was a high school student scheduled to graduate in June 1990 and was dependent on his parents; Sarah was emancipated and married.

At the time of dissolution, Judith was 52 and Michael was 53 years of age. Both had college degrees. Judith was a housewife during the marriage and was not employed. She had income from investments, gifts, and trusts. Michael had been employed from 1958 to 1972 by General American Transport Corporation and its successor, GATX Corporation. Since 1972, Michael was employed by the Eddy Corporation. In the year before dissolution, he earned a salary of $250,000.

Michael possessed a number of business assets which were acquired during the marriage and which ultimately were configured into two entities: (1) Eddy Properties, Ltd., a partnership which owned real estate primarily located in Florida and North Dakota and (2) Eddy Corporation, which owned and operated 25 McDonald's restaurants. He owned each entity equally with his brother, Ray Eddy, Jr. (Ray).

During his lifetime, Michael's father had given certain North Dakota ranch and farm property as gifts to Michael and Ray. They ran this business under a partnership called Eddy Brothers. After the death of Michael's father in 1967, the remainder of his father's ranch and farm business in North Dakota and certain Chicago business interests were devised to Michael, Ray, and their father's widow. The partnership, which had changed its name to Eddy Farms, eventually purchased the widow's interests in the property. There was evidence that in 1967 the estate had a gross value of $1.9 million. Eddy Properties, Ltd., eventually evolved from Eddy Farms.

In 1969, Michael and Ray formed Eddy Foods, a partnership which purchased three McDonald's restaurants in Florida. The money to purchase the restaurants came from loans made to the brothers and from a mortgage and loan secured by the property owned by Michael and Ray. Pursuant to the Eddy Foods partnership agreement, each brother's capital contribution to the partnership was $2,500. Eddy Corporation eventually evolved from Eddy Foods.

During the marriage, Judith's grandmother, Constance Blumenthal, died and left two trusts each worth about $1.9 million, in the names of Judith's parents, James L. Cook, Jr., who was 85 years of age at the time of dissolution, and Helen M. Cook, who was 83 years of age at that time. The trust funds were invested in a diversified portfolio of stocks, bonds, and money-market instruments. Judith was an eligible beneficiary of these trusts, subject to the discretionary power of the trustee and her father. Additionally, Judith received gifts-in-kind of stock from her parents, which the parties stipulated were nonmarital property. These separate stocks were valued at $45,241 at the time of dissolution.

The circuit court concluded that there was an oral agreement between the parties that what was Judith's was hers and what was Michael's was his. The court found that, although Michael's business interests had been acquired during the marriage, since no family income or marital money was used to acquire those business interests or was used for business loans and since no marital property was ever pledged as security on any loans relating to those business transactions, the presumption that Eddy Corporation and Eddy Properties, Ltd., were marital property was rebutted by clear and convincing evidence. The court therefore concluded that no reimbursement to the marital estate from Michael's estate was required.

The circuit court further found that Judith had a "½ interest" in the Blumenthal trust funds; it classified this interest as nonmarital property; and it valued her interest at $1.9 million. The circuit court found that Judith never asked for more money from the Blumenthal trust, but that, in its opinion, "she would not have been denied had she asked and she could do so at this time."

Based upon its findings, the court apportioned the property in the following manner:

### Judith's Nonmarital Property

| | |
|---|---:|
| Continental Bank ½ Cook-Blumenthal Trusts | $1,933,000.00 |
| Furs | 2,700.00 |
| Jewelry | 72,145.00 |
| Silver | 5,890.00 |
| Furniture | 20,475.00 |
| 1 one-ounce Kruggerand | 436.00 |
| ½ of Coin Collection | 31,000.00 |
| Nonmarital Securities | 45,241.24 |
| TOTAL | $ 2,110,887.24 |

### Michael's Nonmarital Property

| | |
|---|---:|
| Interest in Eddy Corporation | $ 6,200,000.00 |
| Interest in Eddy Properties, Ltd. | 2,256,402.00 |
| Note Receivable, with accrued interest | 199,665.00 |
| Furniture in his possession | 1,315.00 |
| TOTAL | $ 8,657,382.00 |

### Marital Property—60% to Judith

| | | |
|---|---|---:|
| Bank Accounts in her name | | $20,000.00 |
| CD's in her name | | 25,000.00 |
| IRA's and Marketable Securities in her name | | 107,900.33 |
| House and 5 acres at 102 Otis Road, Barrington Hills | | |
| FMV | 865,000 | |
| less mortgage | 89,000 | |
| | | 776,000.00 |
| 1988 Oldsmobile Calais | | 15,161.00 |
| Jewelry | | 3,900.00 |
| Furniture in her possession | | 17,480.00 |
| 60% of pension fund | | 69,588.00 |
| TOTAL | | $1,035,029.33 |

### Marital Property—40% to Michael

| | | |
|---|---|---:|
| Bank Accounts in his name | | $10,164.00 |
| CD's in his name | | 4,525.00 |
| 7 and 5 acre lots adjacent to 102 Otis Road | | 395,000.00 |
| Sailboat | | 32,500.00 |
| Furniture in his possession | | 20,000.00 |
| 40% of pension fund | | 46,392.00 |
| House at 21 Hawthorne Road, Barrington Hills | | |
| FMV | $510,000 | |
| less debt | 500,000 | |
| | | 10,000.00 |
| Ormond Beach, Florida home | | |
| FMV | $350,000 | |
| less debt | 350,000 | |
| | | -0- |
| Crystal River, Colorado, house | | 40,000.00 |

Aloha Center Interest
  Net Present Value  $144,000
  Less Related Debt    62,000

| | |
|---|---:|
| | 62,750.00 |
| Joint Venture Interest | 2,600.00 |
| Stock - Equine | -0- |
|    - Aries | 1,500.00 |
|    - C.E.H. | 15,167.00 |
| Life Insurance | 4,560.00 |
| 10 one-ounce Kruggerands | 4,360.00 |
| TOTAL | $649,518.00 |

The circuit court ordered that Michael pay $3,000 per month in child support; that neither party was responsible for maintenance payments; that the parties pay their own attorney fees; and that, because of a faulty summary of business records, Judith's attorneys pay a sanction of $1,000 to Michael.

## I

Judith initially maintains that the circuit court erred in classifying Michael's business interests as nonmarital property. She specifically contends that Michael failed to prove by clear and convincing evidence that he acquired his stock in Eddy Corporation in exchange for nonmarital property.

■ Prior to assigning or dividing property upon dissolution of marriage under section 503 of the Illinois Marriage and Dissolution of Marriage Act (the Dissolution Act), the court must classify it as either marital or nonmarital. (Ill. Rev. Stat. 1987, ch. 40, par. 503.) Normally, property acquired by either spouse after the marriage, but prior to judgment of dissolution, is presumed marital property regardless of how title is held. (Ill. Rev. Stat. 1987, ch. 40, par. 503(b); *In re Marriage of Rogers* (1981), 85 Ill. 2d 217, 422 N.E.2d 635.) Property obtained by gift, legacy, or descent, or in exchange for property acquired by gift, legacy, or descent, however, is excepted from marital property and is classified as nonmarital property. (Ill. Rev. Stat. 1987, ch. 40, pars. 503(a)(1), (a)(2).) Thus, the property given to Michael by gift and the property distributed to him upon the death of his father fell within the exception and were properly classified as nonmarital.

As to newly acquired property, clear and convincing evidence is required to show that it has been acquired in exchange for nonmarital property in order to classify it as nonmarital property (*In re Marriage of Rogers*, 85 Ill. 2d 217); any doubts must be resolved in favor

of finding that the property is marital. (*In re Marriage of Brooks* (1985), 138 Ill. App. 3d 252, 486 N.E.2d 267.) Once marital and nonmarital funds are commingled and lose their identity through the acquisition of a newly created asset during the marriage, the asset is marital. Ill. Rev. Stat. 1987, ch. 40, par. 503(c)(1); see *In re Marriage of Malters* (1985), 133 Ill. App. 3d 168, 478 N.E.2d 1068.

Judith's contention is that Michael failed to prove by clear and convincing evidence that the businesses he held at the time of dissolution were acquired in exchange for nonmarital property. Her premise is that Michael failed to present clear and convincing evidence that the three McDonald's franchises, the genesis of the Eddy Corporation, were acquired in exchange for nonmarital property. She argues that the evidence established that Michael and Ray borrowed all of the money needed to buy the franchises and that they did not exchange nonmarital property for the franchises nor did they repay the loans with nonmarital property. We disagree.

■ The circuit court correctly determined, after tracing the stock of Eddy Corporation back to Eddy Foods, that the funds used to purchase the McDonald's restaurants were nonmarital; thus, the presumption that the stock of Eddy Corporation was marital property was rebutted. Evidence at trial established that two loans totaling $275,000 were obtained in August 1969, secured by property owned by Michael and Ray prior to August 1969. Evidence further established that Michael and Ray obtained loans for $111,000 from the Commercial Bank of Daytona; that an additional $90,000 was loaned to the brothers from relatives; that Michael and Ray used the money to close the purchase of the McDonald's restaurants; and that Judith did not want to invest money in the venture.

The record further shows that the partnership agreement creating Eddy Foods stated that the capital of $5,000 was contributed equally by each of the partners, Michael and Ray. Michael's initial capital contribution of $2,500 into Eddy Foods is shown as a draw from Eddy Farms. All the loans were included on the books as a debt of Eddy Foods.

Most of the loans were paid by proceeds of the McDonald's restaurants. Michael and Ray obtained another loan, secured by the same property as the original loan, which was used to pay the amount remaining on the $275,000 loan. Additionally, one loan was cancelled without being repaid after it was bequeathed to Michael and Ray, and another loan held by Ray's second wife has had none of its principal repaid, although monthly interest has been paid from revenues of the McDonald's business.

The $5,000 listed as capital and the funds to purchase the McDonald's restaurants were derived from Eddy Farms. At the time of purchase, Michael's salary was approximately $24,000 and the house of the parties was then valued at $64,000. These figures and the documents in the record show that the collateral for the loans of money and the funds used to purchase the McDonald's restaurants were derived from the properties Michael received through inheritance and as gifts. Michael did prove by clear and convincing evidence that the property which formed Eddy Foods was nonmarital property. Furthermore, since the McDonald's business itself repaid the loans, there was clear and convincing evidence that the assets were acquired by exchanging nonmarital property for them. (*In re Marriage of Rogers*, 85 Ill. 2d 217; *In re Marriage of Brooks*, 138 Ill. App. 3d 252.) The circuit court therefore properly concluded that Eddy Properties and Eddy Corporation were formed from nonmarital funds. Michael's interest in Eddy Corporation was therefore properly classified as nonmarital property.

## II

Judith maintains that the circuit court erred in not ordering that the marital estate be reimbursed for Michael's uncompensated and significant contribution, from 1969 to 1983, of personal effort to the farm and ranch business, which evolved into Eddy Properties, Ltd. She contends that Michael's efforts resulted in substantial appreciation of the North Dakota property.

■ Section 503(c)(2) of the Dissolution Act provides that a spouse's nonmarital estate is to reimburse the marital estate for the spouse's contribution of significant personal effort to nonmarital property which results in substantial appreciation of that property. (Ill. Rev. Stat. 1987, ch. 40, par. 503(c)(2).) The party claiming reimbursement must prove that the property has substantially appreciated through the significant personal efforts of the spouse. (*In re Marriage of DiAngelo* (1987), 159 Ill. App. 3d 293, 512 N.E.2d 783.) An increase in value which results from inflation or other factors which are external to the marriage is not synonymous with appreciation arising from the personal effort contemplated by the statute. *In re Marriage of Morse* (1986), 143 Ill. App. 3d 849, 493 N.E.2d 1088.

■ Though Judith testified that Michael bragged to friends about how he had improved the property, the record does not establish by clear and convincing evidence Judith's contention that Michael contributed significantly to the farm and ranch properties in North Dakota between 1969 and 1983. There was evidence that when Ray

moved to Florida in 1969 to oversee their business interests there, Michael developed a role in managing the North Dakota business. However, before that time, Michael had no role in the running of that business. Occasionally, Michael flew to North Dakota to survey property if it was deemed necessary and there were telephonic communications regarding any business concerns. Although there was evidence that Michael approved and negotiated sharecropping agreements with tenant farmers and ranchers, negotiated financing arrangements with bankers, and bought and sold parcels of land, the agriculture department at the bank managed the properties and was paid a fee for its services.

Though Judith asserts that Michael's limited partnership interest in Eddy Properties, Ltd., valued at $2,256,402 at the time of dissolution, represents a substantial appreciation from his one-third interest valued at approximately $1,900,000 at the time of acquisition, we cannot say that the circuit court erred in holding that the evidence was not clear and convincing that this increase was due to the significant efforts of Michael. Reimbursement to the marital estate was therefore not required.

### III

Judith next asserts that the circuit court erred when it failed to award her additional property or maintenance because its decision was based on speculation about future events. She contends that the property distribution left her a $60,000 annual shortfall between income and expenses. Further, Judith contends that the circuit court erroneously reasoned that she had a vested half interest in the Blumenthal trusts and that she could control the trusts' investments and distributions. Judith contends that an award of additional property or of maintenance, either of which would alleviate the shortfall, is necessary.

Michael maintains that the circuit court properly weighed Judith's interest in the Blumenthal trusts as a relevant factor to be considered in arriving at a just division of the parties' property, and in determining whether Judith had established a right to maintenance. He argues that the circuit court did not improperly speculate about a future event when it considered the Blumenthal trusts and that it did not misunderstand the nature and extent of Judith's rights in the trusts.

■ Although a reviewing court will not disturb the circuit court's equitable distribution of property without a showing of an abuse of discretion (*In re Marriage of Weinberg* (1984), 125 Ill. App. 3d 904, 466 N.E.2d 925), when there is an error of law, the distribution is re-

viewable *de novo*. (*In re Marriage of Skinner* (1986), 149 Ill. App. 3d 788, 791, 501 N.E.2d 311.) This court must look to the trust document itself to determine whether Judith had a half interest in the trusts at the time of dissolution.

Paragraph 4.1 of the trust document creates two lifetime trusts, one for each of the beneficiaries, James L. Cook, Jr., and Helen M. Cook. The document states that the trustee may decide to pay such beneficiary and his or her descendants proportions which the trustee determines, "considering the best interests and welfare of such beneficiary and his or her descendants *in that order and as a group.*" (Emphasis added.) The trustee is given the discretion of what to pay to the beneficiaries, but must consider the primary beneficiary first and then the secondary beneficiaries, the descendants of James and Helen Cook, as a group, afterwards. Under paragraphs 4.8 and 4.9 of the will, the trustee and Judith's father have discretion over the investment of the funds; her father may in writing direct investments, but no other eligible beneficiary has the right to veto the trustee's investment decisions.

A reading of the trust document makes it clear that Judith does not have a present interest of $1.9 million in the trusts. Judith's present interest is an eligibility to receive a portion of the trust if her father so directs or if he dies intestate. Contrary to Michael's assertions that Judith, as a descendant of James Cook, has a present half interest subject to disfeasance, she actually has a right to receive a limited amount of funds per year and is eligible, with five other persons, to receive an interest in the trusts. The circuit court therefore erred when it concluded Judith's interest to be a current one-half share of the trusts.

■ Although the circuit court could consider her present interest in the trust, it could not consider her eligibility to receive a portion of the trust because that is an expectancy and not a realization. (*Goodpasteur v. Fried* (1989), 183 Ill. App. 3d 491, 494, 539 N.E.2d 207; *Croslow v. Croslow* (1976), 38 Ill. App. 3d 373, 347 N.E.2d 800.) Potential inheritances, just as expected degrees or licenses, are not property which can be valued and awarded to a spouse, although they can be a given some consideration in determining property distribution. (*In re Marriage of Weinstein* (1984), 128 Ill. App. 3d 234, 244, 470 N.E.2d 551; *In re Marriage of Benz* (1988), 165 Ill. App. 3d 273, 287, 518 N.E.2d 1316; *In re Marriage of Woodward* (1980), 83 Ill. App. 3d 253, 256, 404 N.E.2d 575.) The circuit court therefore erred when it apportioned an eligible interest to Judith as a current asset.

■ Judith has received small discretionary distributions from the trust funds from time to time, but never more than $5,000 in any 12-month period. The circuit court erred when it suggested that Judith could cure her $60,000-per-year shortfall by asking the trustee to increase the amount of these discretionary payments. Although the trust provides that the trustee may make payments to provide for the best interests of the beneficiaries, the trustee cannot, under the terms of the trust, disburse any amount to Judith without doing the same for other secondary beneficiaries. Because of medical expenses and other needs of the primary beneficiaries, it might not be prudent (see Ill. Rev. Stat. 1987, ch. 17, par. 1675) for the trustee to make such payments. Furthermore, the circuit court improperly suggested that Judith could increase her income by directing the trustee to invest the funds at higher interest rates, for the trust document did not empower her to do so.

The circuit court's error in determining that Judith had a present interest in the Blumenthal trust necessitates a remand to the circuit court for the purpose of curing Judith's shortfall between income and expenses by apportioning property differently or by providing maintenance.

■ Judith also contends that the circuit court erred by awarding her less than the statutory 20% of Michael's salary for child support. Considering, however, that Michael is paying for their son's school, car, and health insurance, the $3,000-per-month payment which was ordered appears to meet the son's needs, and the circuit court did not err by so ruling. The order incorporated the previous child support order, which included that Michael pay extras beyond the $3,000 (insurance, tuition, etc.) until their son graduates; thus, Judith is able to require these payments until that time.

IV

■ Judith maintains that the circuit court erred when it assigned the parties the responsibility for payment of their own litigation expenses without a hearing.

As Michael points out, however, the circuit court invited Judith to present the reasonableness and amount of her fees and expenses to the court. In pertinent part the court stated as follows:

"The court believes that it must be mentioned that each side may ask for an itemized bill for their attorneys according to the *Pitulla [In re Marriage of Pitulla* (1986), 141 Ill. App. 3d 956, 491 N.E.2d 90,] and the *Kaiser [Kaiser v. MEPC American Properties, Inc.* (1987), 164 Ill. App. 3d 978, 518 N.E.2d 424,]

cases. When presented with that itemization, even if some money has been paid, the parties may review the itemization. If they differ with the itemization or wish to negotiate a lower figure, they may do so. However, if after negotiation they still are unhappy with the money charged by their attorneys, they may ask the court to adjudicate the fee petitions to determine the amount of money they should pay in attorneys' fees and costs."

Judith asserts that she did not disagree with her attorneys' bill and was not unhappy, and for that reason did not need to petition the court. However, the circuit court clearly stated that if the parties wished to negotiate a lower figure they could seek the court's intervention. Moreover, ordering the parties to pay for their own attorney fees was not an abuse of discretion and was an equitable division, albeit not an equal one. See *In re Marriage of Benz* (1988), 165 Ill. App. 3d 273, 518 N.E.2d 1316; *In re Marriage of Borg* (1981), 96 Ill. App. 3d 282, 421 N.E.2d 214.

## V

■■ Judith contends that the circuit court erred when, without a hearing, it imposed sanctions on her counsel for preparing a summary of business records, which was not a pleading, motion, or other paper signed and filed by counsel. She further asserts that the court's action was arbitrary because her counsel never referred to or incorporated the summary in any court filing, the summary was prepared with reasonable cause, and Michael never identified specific attorney fees incurred as a result of receiving the summary.

Section 2—611 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—611, repealed by Pub. Act 86—1156, eff. August 10, 1990) was penal in nature and had to be strictly construed according to its terms. (*Fried v. Barad* (1989), 187 Ill. App. 3d 1024, 543 N.E.2d 1018.) Section 2—611 was properly confined to papers filed in court, or at least to an oral motion. (See *Modern Mailing Systems, Inc. v. McDaniels* (1989), 191 Ill. App. 3d 347, 547 N.E.2d 762.) The purpose of the section was not to provide a sanction against all violations of court rules and for all professional misconduct of an attorney. *Tabor & Co. v. Gorenz* (1976), 43 Ill. App. 3d 124, 132, 356 N.E.2d 1150.

Here, the summary of business records was not filed with the court. Although the figures provided a basis for Judith's pretrial memorandum filed with the court, the summary itself was not subject to section 2—611 as it was not a paper signed and filed by counsel.

Furthermore, there is no proof that the document was not prepared "to the best of [the attorney's] knowledge, information, and belief formed after reasonable inquiry" (Ill. Rev. Stat. 1987, ch. 110, par. 2—611) that the summary of business records accurately portrayed the balance sheet of Eddy Properties, Ltd. We note that both parties prepared other financial summaries which were later shown to be inaccurate and yet were not subject to attorney fees under section 2—611. See *Precision Components, Inc. v. Kapco Communications* (1985), 131 Ill. App. 3d 555, 475 N.E.2d 1071.

Finally, the attorney fees were imposed without a hearing concerning the reasonableness of the summary of business records and of the attorney fees, and without a time summary which contained information concerning the nature of time expended and what that actual time was, the identity of who performed the service, the relation of the time spent to the untrue statements, and whether they were required services. (See *Fried v. Barad*, 187 Ill. App. 3d at 1028-29; *Kaiser v. MEPC American Properties, Inc.* (1987), 164 Ill. App. 3d 978, 518 N.E.2d 424; *In re Estate of Palm* (1973), 11 Ill. App. 3d 24, 295 N.E.2d 580.) Considering all the foregoing circumstances, we conclude that the circuit court abused its discretion when it imposed attorney fees on Judith's counsel. Accordingly, that portion of the judgment is reversed.

For the foregoing reasons, the judgment of the circuit court is affirmed in part, reversed in part and remanded for a hearing consistent with this opinion.

Affirmed in part; reversed in part and remanded.

SCARIANO, P.J., and BILANDIC,* J., concur.

---

*Justice Bilandic participated in this decision prior to his election to the Illinois Supreme Court.