*In re* MARRIAGE OF MARY JACQUELINE ABRELL, Petitioner-Appellee, and JOHN GEORGE ABRELL, Respondent-Appellant.

Fourth District No. 4—06—0974

Argued June 13, 2007.—Opinion filed November 19, 2008.

MYERSCOUGH, J., specially concurring in part and dissenting in part.

William F. Moran III (argued), of Stratton, Giganti, Stone & Kopec, of Springfield, for appellant.

Mary Lee Leahy (argued), of Leahy Law Offices, of Springfield, for appellee.

JUSTICE KNECHT delivered the opinion of the court:

In this dissolution of marriage proceeding, the circuit court of Sangamon County, after a trial on the merits, entered a judgment of

dissolution which dissolved the marriage of the parties and resolved issues concerning maintenance and property. After postjudgment proceedings, the trial court entered several additional orders concerning maintenance and property. Respondent appeals, contending the court erred in (1) categorizing his sick and vacation days as marital property and (2) failing to reduce an award of maintenance. We affirm in part as modified, reverse in part, and remand with directions.

## I. BACKGROUND

The parties were married on June 2, 1984, and one child, John M. Abrell (Matthew) was born of the marriage on August 26, 1986. On March 10, 2003, petitioner, Mary Jacqueline (Jacquie) Abrell, filed a petition for dissolution of marriage. At the time the petition was filed, respondent, John George Abrell, was 53, Jacquie was 58, and Matthew was 16.

In April 2003, the trial court awarded Jacquie temporary custody of Matthew and exclusive possession of the marital residence. Later in April 2003, the trial court set John's child-support obligation at $912 per month and ordered him to pay temporary maintenance of $1,600 per month with $990 to go to Jacquie and the remainder to the mortgage payment on the marital residence. In setting these amounts, the trial court found John had a semimonthly net income of $2,278.49 and Jacquie had failed to show she was unemployable, a factor that the court would consider later in setting maintenance.

In August 2004, a trial was held on all outstanding issues. At the time of trial, Jacquie was 59 years old. She had a high-school education and was a graduate of beauty school. Prior to her marriage to John, Jacquie worked part-time at a budget counseling service, then full-time as an account clerk for the Illinois Attorney General's office. In August 1983, Jacquie obtained a job as an executive secretary at the Springfield recreation department and made approximately $14,000 per year. She remained in this job until April 1987, approximately nine months after Matthew was born.

Jacquie left her job with the recreation department to stay home with Matthew, who suffered a string of illnesses at daycare. John testified he and Jacquie agreed she would return to full-time work when Matthew started school in 1991 although Jacquie never returned to work on a full-time basis during the marriage. The parties argued over Jacquie not returning to work. John conceded he could not force Jacquie to return to work. Jacquie worked intermittent part-time jobs as an attendant at Matthew's day care, as a playground supervisor and crossing guard at his school, and as a nursing home companion and housekeeper for a relative. She was, however, primarily a homemaker throughout the marriage.

For the first few months of the marriage, John worked as an attorney for the Illinois Attorney General. He then began working as an attorney for the Illinois Department of Public Health in August 1984, where he continued through the time of time of trial in August 2004. At that time, John earned approximately $72,000 per year and had accrued 115 sick days and 42 vacation days through his employment with the State of Illinois. John testified it was possible he would have to use those accumulated days for health reasons because he was diagnosed with prostate cancer in December 2003. He had surgery on January 22, 2004, and used "quite a few" of his sick days when he received this treatment. Because of the probability he would need to use his accumulated sick days and vacation days for health reasons, John requested the trial court not treat these days as marital property to be distributed in this proceeding.

Jacquie testified she had applied for a significant number of jobs since the temporary hearing and supplied a list of places she applied. She could not find a job. Jacquie testified she had certain health problems, including the following: she had undergone an operation on her feet in April 2004; she has bursitis in her knees and hips, as well as high blood pressure, osteoporosis, histoplasmosis, anxiety, depression, mitral valve prolapse, and psoriasis. Jacquie testified her most serious health problems were asthma, diagnosed when Matthew was born, and emphysema, diagnosed more recently. She has been hospitalized several times on account of these conditions for up to 10 days at a time, the last being in February 2003. On cross-examination, Jacquie admitted she smoked cigarettes when she was diagnosed with asthma in 1986, and she continued to smoke through her last hospitalization in 2003.

At the time of trial, Jacquie testified her only income came from child support and maintenance. Jacquie listed her monthly expenses as $2,925.86, which included a mortgage payment of $610 and $407 per month for COBRA insurance she expected to pay when the parties were divorced. Matthew would turn 18 two days after the trial but his child support would continue until June 2005 when he was scheduled to graduate from high school.

On February 1, 2005, the trial court issued its memorandum opinion. The trial court continued John's child-support obligation of $912 per month, terminating May 31, 2005. For maintenance, the trial court ordered $1,000-per-month maintenance effective January 1, 2005, until June 1, 2005, when it increased to $1,500 per month. Further, the court stated as follows:

"The [c]ourt finds this is an appropriate case for permanent maintenance. The maintenance[,] however[,] should be subject to

review upon the request of either party by filing a proper pleading within 60 days after the occurrence of the cessation of [r]espondent's duty to pay educational expenses pursuant to [section] 513 or the [r]espondent's retirement. The [c]ourt does not find the [p]etitioner to be unemployable but is aware that her age, education[,] and health may be factors which limit the employment options available to her. The duration of the marriage is also a compelling factor for such an award."

Jacquie was allowed to remain in the marital residence until June 15, 2005, with John responsible for mortgage payments. John was also allowed to purchase Jacquie's interest in the property for $42,937.52.

In its memorandum opinion, the trial court also stated:

"[I]t is *** abundantly clear that the [c]ourt is not required to divide marital property equally. Of the 114 sick days the [r]espondent is awarded 45 of those days without those days being subject to division as marital property. The remainder of the sick days and the vacation days are marital property[,] and the value as computed by the [p]etitioner [is] part of the marital estate."

The trial court valued the remaining 69 sick days at $9,585.48 and the vacation days at $12,225.40 for a total of $21,819.88. This amount was incorporated into the marital property distribution and given to John in the judgment of dissolution.

On March 29, 2005, the trial court entered a judgment for dissolution of marriage that included provisions for child support, maintenance, and property distribution, including the marital residence and accumulated sick and vacation days as set forth in the memorandum. On April 27, 2005, 29 days after the entry of the judgment, John filed a motion for reconsideration with a supporting memorandum.

In these pleadings, John alleged Jacquie obtained employment at Horace Mann Insurance Company between the date the trial court issued its memorandum opinion and the date judgment was entered. John requested the trial court reconsider its decision concerning maintenance based on newly discovered evidence and lower his support payments.

John also argued no precedent in the State of Illinois supported finding accumulated sick and vacation days to be marital property subject to distribution in a dissolution-of-marriage proceeding. Alternatively, he argued the income-tax implication of the award should have been considered. Finally, he argued the trial court overvalued the number of days available to him because of limits on how many days he could be compensated for at the time of his retirement and because some days were accumulated before the marriage.

On June 28, 2005, the trial court entered its supplemental

memorandum opinion. On the issue of maintenance, the court continued the matter for an evidentiary hearing. On the issue of the accumulated sick and vacation days, the court found:

"The authorities are divided on the precise question submitted. There is no doubt in the [c]ourt's mind that the sick and vacation days accumulated during the marriage are marital property. One of the problems with the reserved[-]jurisdiction approach is that John could use all of the vacation days before retirement and owe Jacquie nothing. The sick days would be subject to more scrutiny[,] but he could use them all up in small increments without much trouble. If John were to get sick he would most likely spend some of the money from that portion of the marital estate awarded him. The [c]ourt does not place much credence on the future necessary use of sick days because the [c]ourt is dealing with the present in its division of assets. They are definitely an asset at present although subject to some contingencies. Since the statute mandates consideration on tax consequences, the [c]ourt finds that those days should be valued using John's present pay scale and reducing the value obtained by the taxes applicable to the same."

The court rejected John's arguments about overvaluation and inclusion of days earned prior to the marriage.

On February 27, 2006, a hearing was held on the issue of maintenance. Jacquie testified she forwarded her resume to Horace Mann in January 2005. On February 11, 2005, *after* the trial court issued its memorandum opinion on February 1, 2005, Horace Mann offered Jacquie a job, which she started on February 14, 2005. Jacquie admitted by the time the trial court entered its judgment on March 29, 2005, she had been working at Horace Mann for six weeks. She and her attorney did not report the fact she obtained employment to John or his attorney. She did not disclose this information despite the fact she received a discovery request from John prior to the initial trial, which inquired about any employment she had held.

Jacquie's starting salary at Horace Mann was $13,860 per year. The job's benefits included health insurance for Matthew and herself for $190 per month, compared to the $407 per month she had anticipated for COBRA insurance for herself. Jacquie also had dental insurance, dependent and supplemental life insurance, and retirement benefits.

Jacquie left her job at Horace Mann on September 23, 2005, to take a new job at the Southern Illinois University School of Medicine (SIU), which paid more and had better benefits. Jacquie's attorney disclosed this new job to John and his attorney. Jacquie's starting salary at SIU was $16,608 per year. Jacquie immediately received vacation benefits because she previously had worked for the State of Il-

linois. She also earned "comp time" and became a part of the State University Retirement System. Medical and dental insurance for both Matthew and herself cost only $116 per month. Jacquie also had life insurance for both herself and Matthew.

After hearing this evidence, the trial court denied John's motion for reconsideration as it pertained to maintenance because Jacquie obtained her employment after the proofs had closed at trial. It stated its memorandum of opinion was actually the court's order and the judgment was merely "icing on the cake." The court then allowed the parties to proceed as if a motion to modify maintenance were on file.

Jacquie testified she was meeting her expenses through her pay from SIU and maintenance from John. John purchased her interest in the former marital home and she used the approximately $43,000 she received to purchase and improve her own home. If she did not provide health insurance to Matthew, Jacquie would only pay $27 per month through SIU for her individual health insurance. Jacquie stated her standard of living had fallen since the divorce and she drove a 10-year-old car. She expected expenses for her vehicle, home maintenance, and utilities to increase in the future.

Jacquie listed her total monthly expenses as $2,297.84. She conceded if she took out expenses she was voluntarily paying for Matthew, her expenses would drop to $1,984.84 monthly. She had not incurred any debts since the parties' separation in 2003 and was living within her budget.

John testified he continued to have treatment for prostate cancer and had blood tests taken every three to six months. He was also seeing a psychologist once a month and taking Effexor for depression. John listed monthly expenses of $4,028.28, which included his $1,500-per-month maintenance obligation. He drove a 13-year-old car with over 100,000 miles on it. He had over $21,500 in debts and testified he was not able to save any money despite earning approximately $75,000 per year. John testified his income was not meeting expenses. He had been forced to use nonmarital savings to make up the shortfall, but those funds were almost exhausted. He stated his standard of living had also fallen since the parties' separation and dissolution.

On February 27, 2006, the trial court entered an order finding Jacquie's employment constituted a substantial change in circumstances and allowed the motion for modification, reducing the amount of permanent maintenance to $1,250 per month, effective March 1, 2006. On August 21, 2006, the trial court entered an order finding, after consideration of the tax consequences, the marital portion of John's accumulated sick days was valued at $7,001.82 while the accumulated vacation days were valued at $8,802.29 for a total marital

value of $15,804.11. These figures were then included in the calculations concerning the entire marital estate. The court also found under the original judgment John owed Jacquie $1,086.12 to equalize the division of marital property. However, under the new order, Jacquie owed John $1,917.26 to equalize the division. This balance was ordered paid to John by a reduction in the amount of attorney fees he owed to Jacquie's counsel in the amount of $1,917.26.

On September 19, 2006, John filed a notice of appeal. He argued the trial court had failed to make the reduction in maintenance retroactive to the date of the judgment and had failed to reduce the maintenance award further. John further contends the trial court erred in considering his accumulated sick days and vacation days to be marital property.

## II. ANALYSIS

### A. Accrued Sick and Vacation Days as Marital Property

The categorization of John's accumulated sick and vacation days appears to be one of first impression in Illinois. No statute or previously reported decision in Illinois appears to have addressed the issue. A trial court apparently treated accumulated sick days as marital property in *In re Marriage of Zummo*, 167 Ill. App. 3d 566, 571, 521 N.E.2d 621, 623 (1988). Testimony was given as to their value and that value was awarded to the respondent husband in the property division upon dissolution. *Zummo*, 167 Ill. App. 3d at 571, 521 N.E.2d at 624. This division was mentioned in this court's opinion, but the question of whether such days were marital property was not raised on appeal.

A trial court's classification of an asset as marital or nonmarital property will not be overturned unless it is against the manifest weight of the evidence. *In re Marriage of Didier*, 318 Ill. App. 3d 253, 258, 742 N.E.2d 808, 812-13 (2000). This is based on the presumption that determining whether an asset is marital involves weighing the credibility of witnesses. *In re Marriage of Peters*, 326 Ill. App. 3d 364, 366, 760 N.E.2d 586, 588 (2001). However, when no disputed facts or issues of witness credibility are at issue, a *de novo* standard of review will be applied. *Peters*, 326 Ill. App. 3d at 366, 760 N.E.2d at 588; see *Arnold v. Arnold*, 2003—NMCA—114, ¶¶6-7, 134 N.M. 381, 77 P.3d 285.

The first question we must answer is whether sick days and vacation days accumulated during the marriage constitute marital property. See generally G. Phillips, Annotation, *Accrued Vacation, Holiday Time, and Sick Leave as Marital or Separate Property*, 78 A.L.R.4th 1107 (1990). If we answer this question no, as a matter of law, then we need go no further on this issue.

John contends the trial court erred in finding his accumulated sick and vacation days to be marital property subject to distribution. He cites several cases in support of his argument.

In *Akers v. Akers*, 729 N.E.2d 1029, 1031 (Ind. App. 2000), the husband accumulated 201 unused sick days during the parties' 25-year marriage. His teacher's contract provided a formula for computing the amount his accumulated sick days would be worth as a retirement benefit. The amount was $11,687.50. The trial court treated the husband's sick days as marital property and divided the marital property equally between the two parties. *Akers*, 729 N.E.2d at 1031. The Indiana Appellate Court, as a matter of first impression, reversed the trial court, finding the husband's unused sick days were not a marital asset for purposes of property division. *Akers*, 729 N.E.2d at 1032.

The court found no evidence the husband had a present right to be paid for his sick days other than by becoming ill. The husband also testified the terms of his teaching contract, including those governing retirement benefits, were subject to renegotiation. There was no certainty what contract provisions would be in effect at the time of his retirement. The court noted it was speculation to assume the husband would not suffer any illness and speculation he would have the same amount of unused sick days at their current value at retirement. While acquired during the marriage, the days had only a future value which was indeterminate and speculative. *Akers*, 729 N.E.2d at 1032. The court noted it previously held only property in which a party has a vested interest at the time of dissolution may be divided as a marital asset. *Akers*, 729 N.E.2d at 1033. However, sick leave was not a benefit that automatically vested when earned because the sick leave could only be used for a limited purpose *i.e.*, "[the] employee must be sick or other conditions must be present before [the] employee has a right to use sick leave." *Akers*, 729 N.E.2d at 1033. Because the husband's accumulated sick days had no present value and were " 'contingent and speculative in nature,' " they were not capable of division as a marital asset. *Akers*, 729 N.E.2d at 1033, quoting *Mullins v. Matlock*, 638 N.E.2d 854, 856 (Ind. App. 1994).

In *Thomasian v. Thomasian*, 79 Md. App. 188, 196, 556 A.2d 675, 679 (1989), the husband accumulated more than 180 hours of vacation time and more than 180 hours of holiday time. The evidence was clear he would be paid for accrued vacation time upon termination of employment and suggested the same policy applied to accrued holiday time. *Thomasian*, 79 Md. App. at 197, 556 A.2d at 679. At the husband's rate of pay at the time of dissolution, the accrued time had a total value in excess of $12,000. *Thomasian*, 79 Md. App. at 196, 556

A.2d at 679. The trial court did not consider the accumulated time as marital property. *Thomasian*, 79 Md. App. at 196-97, 556 A.2d at 679.

The *Thomasian* court noted marital property was defined by Maryland law as " 'the property, however titled, acquired by 1 or both parties during the marriage.' Maryland Family Law Code Ann. §8—201(e)(1)." *Thomasian*, 79 Md. App. at 197, 556 A.2d at 679. The court noted nonvested, noncontributory pension plans and stock option plans had been found to be marital property. *Thomasian*, 79 Md. App. at 197, 556 A.2d at 679. The rationale for these findings was these interests represented a form of deferred compensation for services rendered and the employees' right to these benefits was a contractual property right derived from their employment contract. Any contingencies involved should be taken into account when allocating the property rights between the parties. *Thomasian*, 79 Md. App. at 198-99, 556 A.2d at 680. The court then distinguished *Schober v. Schober*, 692 P.2d 267 (Alaska 1984) (a case cited by Jacquie here), where the husband's interest was found to be a chose in action, a form of deferred compensation. *Thomasian*, 79 Md. App. at 199, 556 A.2d at 680-81. Instead, the court found accrued holiday and vacation entitlement *is not* the same as a pension or retirement benefits or forms of deferred compensation, because it replaces wages on days when the worker does not work; therefore, it is an alternative to wages. It is often dissipated when the person takes the vacation or holiday time and, therefore, is not tangible, is more difficult to value, and is more personal than pension or retirement benefits. It is not marital property. *Thomasian*, 79 Md. App. at 200, 556 A.2d at 681.

The *Thomasian* court concluded accumulated vacation days did not *have* to be classified as marital property even though the definition of marital property in Maryland was expansive enough to cover the benefits. They could still be excluded as a matter of law because of their personal, intangible, and speculative nature. *Thomasian*, 79 Md. App. at 200, 556 A.2d at 680-81.

In *Bratcher v. Bratcher*, 26 S.W.3d 797, 798-99 (Ky. App. 2000), the wife accrued approximately $10,800 worth of sick leave and $2,800 worth of vacation leave over the course of a 35-year marriage. If she terminated her employment, she would lose any unused sick leave but would be paid for any unused vacation. *Bratcher*, 26 S.W.3d at 799. This was a case of first impression in Kentucky and the cases cited by the parties here were reviewed by the court in *Bratcher*. The court stated it found the views expressed by the court in *Thomasian* to be most persuasive and adopted the approach used by that court. *Bratcher*, 26 S.W.3d at 800-01.

John argues *Akers* and *Thomasian* are well-reasoned opinions. He

notes it is undisputed he has been diagnosed with and treated for prostate cancer and may need more treatment. The trial court apportioned 45 sick days to him as nonmarital property. If John has to use his sick and vacation days, he will not be paid more in the form of salary but his expected payout at retirement will be diminished as those days can only be paid out at termination or retirement. See 80 Ill. Adm. Code §303.102, amended at 21 Ill. Reg. 15454, 15458-59, eff. November 24, 1997; 80 Ill. Adm. Code §303.290, amended at 16 Ill. Reg. 8368, 8373-74, eff. May 21, 1992. John argues if he has to use all of his sick and vacation days because of illness, he will receive no monetary compensation at retirement while Jacquie's present property distribution will have been significantly increased.

Finally, John contends Illinois law supports following *Akers*, *Thomasian*, and *Bratcher*. He cites *In re Marriage of Eddy*, 210 Ill. App. 3d 450, 569 N.E.2d 174 (1991) (1st Dist.), where a wife's eligibility to receive a portion of a family trust was improperly considered in dividing property as the asset was "an expectancy and not a realization." *Eddy*, 210 Ill. App. 3d at 460, 569 N.E.2d at 181 (wife's present interest was an eligibility to receive a portion of the trust if her father directed or if he died intestate; a potential inheritance). He contends his accumulated sick and vacation days are likewise an expectancy and not a realization.

Jacquie argues the accumulated sick and vacation days are marital property. She states, "*Webster's New World Dictionary*, 3rd ed., 1986, defines [']property['] as 'The right to use, possess[,] and dispose of something.' " Jacquie contends the accumulated days are property that can be used now and they have monetary value. She notes section 503 of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/503 (West 2006)) lists all exemptions to marital property, and accumulated sick and vacation days acquired during employment during marriage are not enumerated as exemptions. All nonexcepted property is characterized as marital property. *In re Marriage of Smith*, 84 Ill. App. 3d 446, 454, 405 N.E.2d 884, 890 (1980) (finding disability pension and insurance proceeds from husband's loss of commercial pilot's license marital because not exempted in Dissolution Act).

Jacquie further notes section 503 of the Dissolution Act contains a presumption all property acquired after the date of marriage but before entry of judgment of dissolution is marital property. The presumption can be overcome only by clear and convincing evidence that property falls into one of the statutory exceptions listed in section 503(a)(1). *In re Marriage of Wojcik*, 362 Ill. App. 3d 144, 154, 838 N.E.2d 282, 292 (2005). She argues John had an obligation to prove by

clear and convincing evidence accumulated sick and vacation days were either (1) not property or (2) not marital property, and he did not meet his burden.

Jacquie contends the accumulated sick and vacation days are property because John can use them, *i.e.*, they can be disposed of by using them or he can be compensated for them when he leaves employment. She also notes the trial court apparently did not have any problem fixing a value on those days and was able to divide the value taking into account John's health and days earned before the marriage.

Jacquie cites cases in other jurisdictions finding accumulated sick and vacation days are a marital asset subject to valuation, division, and distribution at the time of dissolution of marriage and contends they are the better-reasoned holdings. In *Arnold*, 2003—NMCA—114, ¶2, 134 N.M. 381, 77 P.3d 285, at the final dissolution hearing, the husband had accumulated 296.35 vacation-leave hours, valued at $7,112.40, and 812.35 sick-leave hours, valued at $19,496.40, which accrued monthly. The husband had a history of using his vacation- and sick-leave hours before they were forfeited. Upon retirement, he would be paid in cash for unused hours. The court found it was reasonable to value these hours at the husband's present hourly rate and also reasonable to delay payment to his wife of half of this community asset to the date of the husband's actual termination or retirement. *Arnold*, 2003—NMCA—114, ¶2, 134 N.M. 381, 77 P.3d 285.

The *Arnold* court reasoned property acquired during marriage is presumed to be community property because it is the fruit of a spouse's labor during marriage. *Arnold*, 2003—NMCA—114, ¶8, 134 N.M. 381, 77 P.3d 285. New Mexico courts recognized certain employment benefits acquired during marriage are community property subject to division upon divorce: military retirement pay; vested, unmatured interest in a noncontributory profit-sharing plan; vested, unmatured pension benefits; unvested stock options, which are a valuable right in a contingent benefit; and a contingent interest in nonvested, unmatured retirement benefit. *Arnold*, 2003—NMCA—114, ¶8, 134 N.M. 381, 77 P.3d 285. The husband in *Arnold* contended his unused vacation and sick leave were not analogous to retirement or pension benefits or stock-option benefits because unused hours were meant to compensate him for working more hours than he was expected to work during his career. His right to receive payment for accumulated hours was a fringe benefit or a right to future salary and not the same valuable financial assets as retirement and pension benefits. *Arnold*, 2003—NMCA—114, ¶¶12-13, 134 N.M. 381, 77 P.3d 285.

The *Arnold* court found the accumulated leave is a benefit of

employment, and whether it is considered an addition to salary or an aspect of salary, it has independent value. If it is taken during marriage, it benefits the community. If not taken, it will be available to benefit the community in the future. If the community ends, it attaches to the employee. The court saw no policy reason or other rationale why the employee should end up with the full value of a community asset or why such assets should not be divided and should be treated the same as retirement pension or stock-option benefits earned during the marriage. *Arnold*, 2003—NMCA—114, ¶18, 134 N.M. 381, 77 P.3d 285.

Jacquie notes other courts have held the same way. In *Brotman v. Brotman*, 528 So. 2d 550, 551 (Fla. App. 1988), the husband received "earned vacation pay" upon termination of employment. The court found the "earned vacation pay" was a marital asset to be considered when distributing property to achieve an equitable distribution. *Brotman*, 528 So. 2d at 551. In *Schober*, the husband was owed over 400 hours of unused personal leave. This leave could be used as paid vacation or converted to cash. Up to 60 hours could be converted to cash each year and the remainder upon termination of employment. *Schober*, 692 P.2d at 267. The court stated it was a case of first impression but the issue "gives us little pause." *Schober*, 692 P.2d at 268. Even if the husband would lose his interest in the event of his death, the interest was vested at the time of dissolution. The right to a paid vacation, offered in an employment contract, was deferred wages for services rendered, and the right vested when the labor was rendered. *Schober*, 692 P.2d at 268. Thus, the husband's interest was not an expectancy but a chose in action, a form of property, an economic resource capable of being assigned a value. *Schober*, 692 P.2d at 268. The court found because the husband's leave was earned and he could decide to use it or leave it for a later benefit, it was a marital asset subject to consideration in the division of property. *Schober*, 692 P.2d at 268.

In *In re Marriage of Nuss*, 65 Wash. App. 334, 342, 828 P.2d 627, 632 (1992), the wife had a reserved sick-leave account, known as a "Financial Security Plan" (FSP) or the "Reserved Sick Leave Trust Fund," in which her company allowed employees to bank 40 hours of unused sick leave per year. Any unused FSP benefits would be received upon death or retirement. The wife was 100% vested in her FSP account. *Nuss*, 65 Wash. App. at 342, 828 P.2d at 632. The wife argued FSP was compensation for loss of future wages and not an asset subject to distribution. *Nuss*, 65 Wash. App. at 343, 828 P.2d at 632. Washington courts previously held disability payments that are in the nature of compensation for lost future wages are not an asset for

distribution upon dissolution while retirement benefits are considered deferred compensation for past services and those accruing during marriage are community property. *Nuss*, 65 Wash. App. at 343, 828 P.2d at 632. The court found the FSP contained elements of both deferred compensation and future earning replacement. It was similar to vacation leave (which the court "definitely" found to be deferred compensation) because it converted unused sick leave into something akin to vacation leave, which may be used as needed in the event of future illness or taken in cash upon termination of employment. The court then upheld the trial court's characterization of the FSP as an asset for distribution. *Nuss*, 65 Wash. App. at 343-44, 828 P.2d at 632.

In *Lesko v. Lesko*, 184 Mich. App. 395, 401, 457 N.W.2d 695, 699 (1990), *overruled on other grounds by Booth v. Booth*, 194 Mich. App. 284, 290, 486 N.W.2d 116, 119 (1992), the husband had "banked" vacation and sick time worth $22,900 payable upon retirement if not used before then. The court relied upon the *Schober* case because the issue was one of first impression in Michigan. The court stated the issue was not so easily decided as in *Schober*, because it had to balance the possibility the husband would become ill and not retain sick days until retirement against the fact he accumulated the sick and vacation days during the marriage and he had a right to use or be paid for these days and they were capable of being given an assigned value. On balance, the court found "banked" leave days are a divisible marital asset. *Lesko*, 184 Mich. App. at 402, 457 N.W.2d at 699.

The newest case cited is *Yates v. Yates*, 2006—Ohio—743 (Ohio App. February 21, 2006) (unpublished opinion). In *Yates*, the wife accumulated over 190 days of unused sick leave. Relying on previous Ohio cases, the court found sick-leave benefits are marital assets subject to division and distribution because they were accumulated during marriage in exchange for past services rendered and are essentially deferred compensation. *Yates*, 2006—Ohio—743, at ¶17.

■ As noted earlier, the key issue is whether sick days and vacation days accumulated during the marriage are marital property. If not, our inquiry ends. If they are, then we must decide how the property is to be divided. We have carefully considered the cases cited by appellant and appellee and conclude accumulated sick-leave and vacation days are not marital property. They are not property—they are a substitute for wages when, and if, the employee is unable to perform his duties.

The days in this case were a benefit to the intact marital estate because they provided a safety net. They continue to be a benefit and a safeguard to both Jacquie and John. It is true they will have a cash value if they remain unused when the employee retires. It may be pos-

sible to calculate the present cash value for the days assuming they remain unused when John retires. But the question is not whether it would be possible to calculate their value—the question is whether such accumulated days are property and thus marital property under the statutory definition.

Sick days and vacation days are alternative wages meant to be paid when the wage earner is unable to work or decides to take a vacation. In the case of a married couple, the wage earner who is ill or who vacations still contributes wages to the marital estate via this alternative. This is a job benefit with value because it helps protect the marital estate. When a marriage is dissolved, a wage earner who is ill or vacations is still able to pay child support, maintenance, educational expenses for children, and remaining marital debt because he or she has employment that provides sick and vacation days. John cannot assign or transfer his sick or vacation days to another person. He cannot realize any cash benefit from them today other than by resigning or retiring from his employment. Accumulated sick-leave and vacation days are not marital property.

This is a question of law subject to *de novo* review, and we conclude the trial court erred by treating the accumulated sick and vacation days as marital property, assigning a value to them, and including them in the distribution of the marital estate.

## B. Modification of Maintenance

John next contends the trial court abused its discretion when it (1) failed to further reduce Jacquie's maintenance after it determined she obtained a job prior to the entry of judgment where the trial court had previously found she was essentially unemployable and (2) did not make the reduction of maintenance retroactive to the date of the judgment. We disagree.

The facts are not in dispute. Jacquie did not have a job at the time of trial and presented evidence that indicated she might never obtain employment. She secured a job between the date the trial court issued its memorandum opinion and the date judgment was entered. This was not disclosed to either John or his attorney before the judgment was entered. On these facts, the trial court found maintenance should not be modified retroactive to the date of judgment but reduced it from $1,500 to $1,250 per month due to Jacquie's new employment.

An award of maintenance is within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion or if the findings of fact are against the manifest weight of the evidence. *In re Marriage of Charles*, 284 Ill. App. 3d 339, 342, 672 N.E.2d 57, 60 (1996). An abuse of discretion occurs when no reason-

able person would take the view adopted by the trial court. *In re Marriage of Cheger*, 213 Ill. App. 3d 371, 378, 571 N.E.2d 1135, 1140 (1991).

The trial court entered its memorandum opinion on February 1, 2005, setting forth its judgment. The cause was continued for resolution of Jacquie's petition for attorney fees. On February 14, 2005, Jacquie started her new job. On March 29, 2005, the trial court entered its judgment for dissolution, which included all the provisions set forth in its memorandum opinion. On April 27, 2005, John filed a motion for reconsideration with a supporting memorandum. In his memorandum, John stated Jacquie obtained employment at Horace Mann between the date of the memorandum opinion and the date judgment was entered and was making an annual salary of $13,860. John requested the trial court reconsider its decision on maintenance based on this newly discovered evidence and lower the amount he was required to pay Jacquie. A hearing was held on John's motion on June 9, 2005, and the matter was taken under advisement.

On June 28, 2005, the trial court set the maintenance issue for an evidentiary hearing which was not held until February 27, 2006. After hearing evidence as to when Jacquie acquired her job, the trial court denied John's motion for reconsideration because Jacquie obtained her job after the proofs closed at trial and, thus, this was not really newly discovered evidence. The trial court then stated it would treat John's motion as a motion to modify maintenance and proceeded to hear evidence from both parties. The trial court then reduced John's maintenance obligation to $1,250 per month effective March 1, 2006.

The trial court did not abuse its discretion in denying John's motion to reconsider. Jacquie obtained her job after the proofs were closed and after the trial court made its findings on the evidence presented in support of her request for maintenance. No newly discovered evidence required a reconsideration of the trial court's award of maintenance.

If a reconsideration of the evidence had been warranted, John's request to make the lower award of maintenance retroactive to the date of the judgment was the proper procedure. However, the trial court properly denied the motion to reconsider. The trial court then used its discretion to consider John's motion as a motion to modify maintenance. Any modifications of maintenance may be retroactive to installments accruing after due notice of the motion. 750 ILCS 5/510(a) (West 2006). John filed his motion on April 27, 2005, and provided notice to Jacquie on May 5, 2005. Any modification of maintenance could attach to all installments accruing on or after May 5, 2005. We conclude the trial court did abuse its discretion in making the modi-

fied installments effective on March 1, 2006. From February 14, 2005, until March 29, 2005, when the trial court entered judgment, Jacquie had a job, but neither she nor her attorney advised the court, John, or his attorney of that fact. Her lack of employability was a key factor as to awarding maintenance, as well as the amount of maintenance. Jacquie not only obtained employment, but she secured a second, better job before the evidentiary hearing on modification in February 2006. The operative fact that prompted the court to reduce maintenance was known to everyone by May 5, 2005. The modification should have been effective on May 5, 2005.

As to the amount of the reduction in maintenance, "[t]he benchmark for a determination of maintenance is the reasonable needs of a spouse seeking maintenance in view of the standard of living established during the marriage, the duration of the marriage, the ability to become self-supporting, the income-producing property of a spouse, if any, and the value of the nonmarital property." *Cheger*, 213 Ill. App. 3d at 379, 571 N.E.2d at 1140. While the goal after dissolution is for a dependent spouse to become self-supporting, this "does not mean the ability to merely meet one's minimum requirements, but entails the ability to earn an income which will provide a standard of living similar to that enjoyed during the marriage." *In re Marriage of Sisul*, 234 Ill. App. 3d 1038, 1039-40, 600 N.E.2d 86, 88 (1992).

This marriage lasted more than 20 years. There was no income-producing property. There were no significant nonmarital assets. John earned approximately $72,000 per year while Jacquie earned $16,608 at her then-current job at SIU School of Medicine. John contends Jacquie did not present evidence of increased expenses at the hearing on the motion to modify and, in fact, certain expenses such as insurance and health care costs had gone down. He argues if the trial court thought $1,500 in maintenance was sufficient to meet Jacquie's needs prior to her obtaining employment, a reduction below $1,250 was appropriate where she now had $16,608 in additional income.

With the award of maintenance of $1,250 per month, Jacquie's gross income was $31,608 per year while John's yearly gross income was $57,000 after payment of maintenance. Although neither party was able to maintain the standard of living enjoyed during the marriage, John would be able to come closer than Jacquie. While both had health issues, John had a law degree and many years of work experience in the legal field. Jacquie had a high school education and had been out of the work force for approximately 17 years. Jacquie was 60 years old. Her prospects for increasing her standard of living through employment are not good.

The initial maintenance award to Jacquie covered her living

expenses. The reduced award in addition to her salary does not provide her luxuries but will help get her closer to the standard of living she enjoyed during the marriage. Further, the reduced award of maintenance still leaves John with enough income to meet his living expenses. The trial court did not abuse its discretion nor were its fact findings against the manifest weight of the evidence in reducing the permanent maintenance award to $1,250 per month.

## III. CONCLUSION

We affirm the reduced award of maintenance but order it effective as of all maintenance installments accrued after May 5, 2005. We reverse the property distribution and remand, so the trial court, without the need for further evidence, can make an appropriate adjustment in the distribution of property.

Affirmed in part as modified and reversed in part; cause remanded with directions.

STEIGMANN, J., concurs.

JUSTICE MYERSCOUGH, specially concurring in part and dissenting in part:

I concur with the majority on the maintenance issue; however, I respectfully dissent in part. I do not agree that the trial court erred by categorizing John's sick and vacation days as marital property.

The appropriate standard of review in this case is two-fold: (1) whether, as a matter of law, sick and vacation days can be marital property, which this court reviews *de novo*; and (2) if so, whether the trial court's determination that sick and vacation days in the particular case constitute marital property was against the manifest weight of the evidence.

Sick and vacation days can, but may not always, be marital property. In this case, John's sick and vacation days were earned, retained income banked for future use. The majority, by holding that sick and vacation days are not marital property, deprives Jacquie of her interest in property acquired during the marriage. That is, during the marriage, John earned those sick and vacation days by not taking time off and working more hours for the same amount of pay. Now after the dissolution of the marriage, John can use those days earned during the marriage to work fewer days for the same pay *or* receive cash when he retires or leaves his employment. Jacquie is not compensated for this through maintenance. The maintenance Jacquie receives stays the same regardless of the number of days John works

or any compensation John receives when he retires or leaves his employment. She does not receive "additional" compensation for those sick and vacation days earned, but not used, during the marriage. The trial court's determination that the sick and vacation days constituted marital property was not erroneous and the court's distribution of that marital property was not against the manifest weight of the evidence.

For these reasons, I respectfully dissent in part.